UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
-------------------------------------------------------------------- X
ANTHONY P. MIELE, III,                                          :        ____Civ. ____
                                                                :
                              Plaintiff,                        :        **COMPLAINT**
                                                                :        **WITH JURY DEMAND**
               -against-                                        :
                                                                :
CHARLES B. JOHNSON and FRANKLIN                                 :
RESOURCES, INC.,                                                :
                                                                :
                              Defendants.                       :
-------------------------------------------------------------------- X


## COMPLAINT

Plaintiff Anthony P. Miele, III, by his attorneys, Liddle & Robinson, L.L.P., alleges as follows:

## THE NATURE OF THE ACTION

1.      This is a civil action for damages and remedies for breaches of fiduciary duty, negligent prevention of assistance, negligence and fraudulent concealment, and for wrongful registration of a security and to compel replacement of a lost, destroyed, or wrongfully taken security certificate under California Commercial Code §§ 8404 and 8405.


## JURISDICTION

2.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1).  The amount in controversy exceeds $75,000.

3.      The Court has personal jurisdiction over the Defendants under California Code of Civil Procedure § 410.10, and because the Defendants' actions in this state gave rise to the claims at issue here.

## VENUE

4.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims occurred in this District.

## THE PARTIES

5.      Plaintiff Anthony P. Miele, III ("Miele III") is a natural person born June 25, 1971, who resides at 8 Peter Cooper Road, Apt 11G, New York, New York 10010. Miele III is the son of Anthony P. Miele, Jr., who died November 8, 1974, and is the beneficial owner of shares of the defendant Franklin held in a revocable trust in the name "Anthony P Miele Jr TTEE Anthony P Miele III."

6.      Franklin Resources, Inc. ("Franklin" or "BEN") is a Delaware corporation with its principal place of business located at One Franklin Parkway, San Mateo, California 94403-1906. Franklin is one of the world's largest global investment management organizations. The company maintains offices in 35 countries and its common stock is listed on the New York Stock Exchange under the ticker symbol BEN, and is included in the Standard & Poor's 500 Index. The market capitalization of Franklin is over $32 billion.

7.      Charles B. Johnson ("Johnson") is a natural person residing at 1220 South Ocean Boulevard, Palm Beach, Florida 33480. From 1973 until at least 2012, Johnson resided in California, most recently in Hillsborough. Johnson is the former President and Chief Executive Officer of Franklin, and served as the Chairman of the Board of Franklin until June 2013. Forbes magazine listed Johnson, with his net worth of $6.8 billion, as "#72" in their "Forbes 400," "ranking the country's richest billionaires." Forbes states that during Johnson's tenure at Franklin the "company's stock price increased 6000-fold." Johnson is known for his

2

philanthropy, and recently pledged $250 million to Yale University, the largest gift in the University's history. Johnson is also an owner of the San Francisco Giants major league baseball team. Johnson served on the Board of the National Association of Securities Dealers ("NASD") from 1988 to 2002, and was elected Chairman in 1992.  Johnson also served on the Board of Governors of the Investment Company Institute, whose mission includes "encouraging adherence to high ethical standards by all industry participants," from 1973 to 1988.

## OTHER RELEVANT PERSONS AND ENTITIES

8.     The Bank of New York Company, Inc. ("BoNY") was a New York corporation with its headquarters located at One Wall Street, New York, New York 10286.  BoNY acted as transfer agent and corporate trustee to Franklin before its July 1, 2007, BoNY merger with the Mellon Financial Corporation to form The Bank of New York Mellon Corporation ("BNY Mellon"), a Delaware corporation.  In 2011, Computershare Limited acquired the Shareowner Services business of BNY Mellon.  The name of Mellon Investor Services LLC, a BNY Mellon subsidiary, was changed to Computershare Shareowner Services LLC, and from that point operated as a subsidiary of Computershare Limited.

9.     Harmon E. Burns ("Burns") was the former Secretary, Vice Chairman, and Director of Franklin, joining the company after its acquisition of Winfield & Company in January 1973.  After joining Franklin, Burns received a law degree and was admitted to the California bar in 1976.  Initially at Franklin, Burns headed the legal and compliance areas. Thereafter he became one of the most senior Franklin executives.   In a well-publicized transaction, Burns led the group, including Johnson, that purchased and owned the largest stake

in the San Francisco Giants professional baseball team.  Burns died of apparent heart failure on November 8, 2006, at the age of 61.

10.     Anson M. Beard Jr. ("Beard Jr.") is a former member of Morgan Stanley Group's Firm Management Committee and Board of Directors.  Beard Jr. became close friends with Johnson when he served as Vice Chairman of the NASD during Johnson's tenure as Chairman in 1992.  Beard Jr. is also former Chairman of Morgan Stanley Security Services, Inc., a subsidiary of Morgan Stanley Group.  Beard Jr. is currently an Advisory Director of Morgan Stanley.  Beard Jr.'s daughter in law is Veronica Miele Beard, sister of Anthony P. Miele III.

11.     Eugene Walter Mulvihill ("Mulvihill") was the former President and owner of Mayflower Securities Co., Inc.  Mulvihill graduated from Lehigh University in the 1950's where he became friends with Anthony P. Miele, Jr.  Mulvihill owned interests in a number of companies during his lifetime, and partnered with Robert Brennan and John Steinbach in a number of enterprises.  After being indicted by a grand jury in April 1984, Mulvihill pled guilty to multiple counts of fraud and forgery, and was permanently barred from the securities industry in 1986 by the United States Securities and Exchange Commission ("SEC") for, inter alia, the forging of fake insurance policies.  Mulvihill died of a heart attack on October 27, 2012 at the age of 78.

12.     Mayflower Securities Co. Inc. ("Mayflower") was a licensed broker-dealer incorporated in New Jersey in 1963 with headquarters located in New York, New York.  Mayflower was owned by Eugene Mulvihill, who appointed Robert Brennan as President in 1971.  Mayflower underwrote Franklin's initial public offering of 120,000 shares on August 6, 1971.  In 1974, Brennan purchased many of Mayflower's assets and opened First Jersey Securities, Inc.

13.     Robert E. Brennan ("Brennan") is a natural person currently residing at 13 North 5th Avenue, Highland Park, New Jersey 08904.  Brennan was born in February 1944.  He attended Seton Hall University and became an accountant before Mulvihill hired him to join Mayflower at age 24. He later founded First Jersey Securities, Inc.  After being the subject of a number of SEC investigations and proceedings, including a 1994 Judgment against Brennan in an SEC matter for $75 million, Brennan was indicted in 2000 by the United States Department of Justice, was found guilty, and served nearly ten years in prison for crimes including money laundering and bankruptcy fraud.

14.     First Jersey Securities, Inc. ("First Jersey") was a licensed broker-dealer incorporated in New Jersey with headquarters in New York, New York.  First Jersey was opened by Brennan in November of 1974 after an SEC investigation resulted in a suspension of Mayflower.  After the SEC charged First Jersey and Brennan with securities fraud in 1985, First Jersey declared bankruptcy in 1987.

15.     John E. Dell, a/k/a Jack Dell,was the former President of First Jersey, and later became head of sales at Sherwood Capital Group, Inc.  After the sale of offices from Sherwood to F.N. Wolf & Co., Inc., Dell became a consultant to that company, earning a percentage of the sales commissions of brokers and commission overrides of office managers.

16.     Sherwood Capital Group, Inc. ("Sherwood") was incorporated in Delaware in 1981 and headquartered in New York, New York, and adopted the name Sherwood Capital Group, Inc. in 1983.  Sherwood's broker-dealer unit was known as Sherwood Securities Corporation.  In 1987, Sherwood acquired over thirty retail offices of First Jersey Securities, and hired former First Jersey President Jack Dell as head of its retail system.  After a regulatory investigation, Sherwood sold some of those offices to F.N. Wolf & Co., Inc.  Sherwood changed

its name to National Discount Brokers Group, Inc. in 1997.  In 2000, the company was acquired by Deutsche Bank AG.

17.     F.N. Wolf & Co., Inc.  ("FN Wolf") was a licensed broker-dealer incorporated in New York with headquarters at 110 Wall Street, New York, New York.  FN Wolf was incorporated and licensed in 1982.  According to Bloomberg, after the bankruptcy of First Jersey, FN Wolf had "so many former Brennan brokers that regulators dubbed it 'First Jersey II." FN Wolf was permanently banned from the securities industry in 1994 based on fraudulent trades involving Brennan's entities.

18.     Franklin N. Wolf ("Wolf") is a natural person who resides at 15 Sutton Drive, New Vernon, New Jersey 07976, and was born in September of 1939.  Wolf was the President of FN Wolf, and in 1996 was ordered to make restitution of $7.9 million to Wolf customers.  In 1996, Wolf was also banned from the securities industry for life.

19.     John Steinbach ("Steinbach") is a natural person residing in Vernon, New Jersey who was born in September of 1934.  Steinbach is the stepson of, and was raised by his mother and Abner Zwillman, known as the "Al Capone of New Jersey."  Steinbach was a friend and business partner of Mulvihill and Brennan, including acting as the Vice President of Black Bear Golf Club, which Mulvihill owned, and investing in a company owned by Mulvihill's son.

20.     Anthony P. Miele, Jr. ("Miele Jr.") was one of three sons of Anthony P. Miele, Sr. and was born March 10, 1935.  Miele Jr. attended Lehigh University with Eugene Mulvihill in the 1950's and the two were close friends.  Miele Jr. was an engineer and entrepreneur, and was involved in the development of various products and the management of several companies with members of his family and others.  In March 1973, Miele Jr. was living in North Caldwell, New Jersey with his wife, Evelyn Miele, and two infant children, Anthony P. Miele III and Veronica

6

Miele.  Miele Jr. died on November 8, 1974 at the age of thirty-nine, leaving Evelyn, Anthony III, Veronica and nine month old Matthew.

21.    The initial shares in question in this action were held in the name "Anthony P Miele Jr TTEE Anthony P Miele III," which, on information and belief, was formed as a revocable trust and dated May 15, 1973. The corpus was 4,000 shares of Franklin.  After Anthony P. Miele Jr.'s death, no successor was ever named.  Anthony P. Miele III was 3 years old when his father died.  Franklin records confirm that the shares at issue here, at least until March 1991, were at all times owned in that name.

22.    Joseph P. Miele ("J.P.") is a resident of the state of Florida.  J.P. is the brother of the late Miele Jr. and Richard Miele.  After the death of Miele Jr., J.P. ran a number of the companies Miele Jr. had founded.

23.    Anthony P. Miele Sr. ("Miele Sr.") was the father of Miele Jr., J.P. Miele and Richard Miele.  Miele Sr. passed away on May 28, 1994.

24.    Evelyn Shaw Miele ("Evelyn") is a resident of the state of New Jersey.  She was formerly employed by the law firm McCarter & English, LLP as the legal secretary to Julius Poppinga, a partner of the firm.  She is the widow of Anthony P. Miele, Jr., and mother of Miele III, Matthew Miele and Veronica Miele Beard.

25.    Veronica Evelyn Miele Beard ("Veronica") is a resident of the state of New York. She is the daughter of Miele Jr. and Evelyn Miele, and sister of Miele III and Matthew Miele.

26.    Matthew Miele is a resident of the State of New York.  He is the son of Miele Jr. and Evelyn Miele, and brother of Miele III and Veronica Miele Beard. Matthew Miele was born in February of 1974.

27.     McCarter & English, LLP ("McCarter") is a law firm with its main office in New Jersey and other offices on the East coast.  The firm has represented the Miele family for over forty years.  Evelyn Miele was previously employed by the firm, and through that position met her husband, Miele Jr.  Upon Miele Jr.'s death, Evelyn was the Administratrix of his Estate and McCarter represented the Estate through the estate administration process (1974-1983).  Later, McCarter represented Miele III in establishing a will.  Over the years, McCarter has represented Johnson, Franklin, Mulvihill, and others involved in this matter.

## FACTS

28.     Franklin was founded by Rupert H. Johnson, Sr. as Franklin Distributors, Inc., a wealth management company.  It was incorporated in New York in November of 1947.  Franklin's first line of mutual funds was a series of conservatively managed equity and bond mutual funds designed to appeal to retail investors.

29.     In 1957, Rupert H. Johnson's son, Charles B. Johnson, was named as President and Chief Executive Officer of Franklin at the age of 24.  At this point, the company managed assets totaling $2.5 million.

30.     Johnson worked hard to grow while competing with larger firms such as Fidelity, Dreyfus and Wellington.  In order to expand the company, Johnson decided to raise capital through an Initial Public Offering.

31.     On August 6, 1971, Franklin sold 120,000 shares of common stock in its initial public offering ("the IPO") at the price of $5.00 per share, representing 19% of the common stock of the company.  Upon information and belief, Johnson engaged Eugene Mulvihill ("Mulvihill"), owner of Mayflower Securities, and Mayflower, to underwrite the IPO.

32.     Four months earlier, Mayflower's President, Brennan, had been suspended from working in the securities industry in New Jersey for thirty days for failing to inform investors that half of their initial mutual fund purchases would go towards Brennan's commission.

33.     In part from the proceeds of the IPO, Johnson struck a deal to acquire Winfield & Co. Inc., ("Winfield") a San Mateo, California based investment firm with nearly twice Franklin's assets.  The deal was announced in August of 1972.  As part of the deal, Winfield would be merged into a Franklin subsidiary, Franklin Research, Inc.

34.     In addition to more than doubling Franklin's assets, the deal provided Franklin with Winfield's "superior IBM shareholder and transfer agency system," which became the "backbone" of Franklin's service (Alyssa A. Lappen, Reinventing Franklin, Institutional Investor, November 1997 at 58).  The merger took place on January 26, 1973.

35.     Almost immediately after Franklin's acquisition of Winfield, Johnson moved Franklin, and his wife and seven children, to San Mateo, near Winfield's former offices.

36.     Despite the expansion, Franklin was struggling.  Franklin operated at a loss of $86,211 in 1972 and a loss of $2,998 in 1973.  A two year bear market caused the loss of approximately 35% of Franklin's assets under management. Franklin's stock price began to fall.

**I.      Charles Johnson meets with Mulvihill, Brennan and Anthony Miele Jr. about the $100,000 Loan**

37.     On information and belief, in 1973, shortly after the IPO, Johnson contacted Mulvihill, then CEO of Mayflower Securities, to obtain more financing, this time in the form of a loan.  Mulvihill, apparently with the assistance of Brennan, informed Johnson that they could arrange for Mulvihill's friend, Anthony P. Miele, Jr. ("Miele Jr.") to make the loan.  Mayflower, itself having recently completed the IPO of Franklin, was apparently not able, or perhaps willing, to be directly involved.

38.     Miele Jr. was an engineer and entrepreneur, involved in the development of various products and management of several companies with members of his family and others.

39.     By 1973, Miele Jr. was the controlling shareholder of both PCI International, Inc., and Pollution Control Industries, Inc., located at One Fairfield Crescent, West Caldwell, New Jersey, and part owner of Modern Transportation Co. and A & S Transportation Co., located at 75 Jacobus Avenue, South Kearny, New Jersey, all of which were involved in the waste management and sludge business in New Jersey and the Philadelphia metropolitan area.

40.     Prior to Miele Jr.'s death on November 8, 1974, Miele Jr. and his wife, Evelyn, had frequently socialized with Mulvihill, Steinbach and their wives.

41.     On information and belief, Miele Jr. made a loan in the amount of $100,000 to Johnson at a meeting with Miele Jr. that Mulvihill and Brennan also attended. According to Johnson, the loan proceeds were used to solidify the Winfield acquisition.

42.     No documentation of that loan appears to exist.  Johnson has stated that at the time this loan was documented with a promissory note and listed on the public books and records of Franklin as part of its capital structure.  Johnson has further stated that the loan was for a term of either three or five years, and that this loan was fully repaid with interest.  No documentation of Johnson's contentions exist, and Miele Jr. died 1 ½ to 3 ½ years before the "term" of the loan ended.    No repayment of principal or interest for the loan was made to the Miele Jr. Estate. Johnson contends that 4,000 shares of Franklin stock were given to Miele Jr. as a "bonus" for providing the loan.

## II.     Miele Jr. Acquires Franklin Stock in Trust for Miele III

43.     In March 1973, Miele Jr. was living in North Caldwell, New Jersey with his wife, Evelyn, and their two infant children, Miele III and Veronica.

44.     Based on Miele Jr. Estate files created and maintained by McCarter & English, stock certificate number NU-02763 for 4,000 shares of Franklin was "dated" March 15, 1973 and owned by "Anthony P. Miele Jr. TTEE Anthony P. Miele III."   The share certificate was "stamped to show restrictions on transfer."   On March 15, 1973, the value of that stock was approximately $100,000.00.

45.     March 21, 1974, records of Franklin reflect "Anthony P. Miele Jr. TTEE Anthony P. Miele III" owned 4,000 shares of Franklin, which were "voted" at a shareholders' meeting on that date. The address of record was Modern Transportation Co., 75 Jacobus Avenue, South Kearny, New Jersey 07032.

46.     On November 8, 1974, Miele Jr. died suddenly and unexpectedly at age 39.  The cause of death was listed as "hypertensive cardiovascular disease" with "cardiac hypertrophy" and "cardiac insufficiency."   Miele Jr.'s death certificate sets 7:00 p.m. as the time of death. Before he collapsed he was at an Italian restaurant he owned, "Stash's," in Orange, New Jersey. Miele's wife Evelyn was informed of Miele Jr.'s death hours later, long after his family (his parents and brothers) had been informed.  Poppinga, the McCarter & English partner who was the Miele family attorney, informed Evelyn near midnight. Miele Jr. was survived by his wife, Evelyn, and three children, Miele III, age three, Veronica, age two, and Matthew, who was then nine months old.

47.     At the time of Miele Jr.'s death, 4,000 share certificate NU-02763 was worth approximately $16,000.00.   After Miele Jr.'s death, the 4,000 share certificate was held by McCarter & English, the Estate attorneys, either in a safety deposit box opened for the Estate, or at their offices, until the windup of the Estate in 1983.

48.     Over time, these 4,000 shares of Franklin paid dividends, and additional shares were issued in the name of "Anthony P. Miele Jr. TTEE Anthony P. Miele III" due to stock splits.  By March 4, 1991, The Bank of New York, transfer agent to Franklin, held $186,496.88 in uncashed dividend checks for the account, "stock certificates in [its] vaults represent[ed] 128,125 shares" and "records reflect[ed] 12,500 shares held by the shareholder" for a "total position [of] 140,625 [shares]."

49.     Due to stock splits since March 4, 1991, the 140,625 1991 shares, today represent 2,531,250 shares of Franklin.   Additional dividends issued after March 4, 1991 total $19,637,578.13 by December 31, 2014.   At the January 8, 2015 closing share price of approximately $54.00, the total value of the stock exceeds $136,000,000.00.

50.     Through a variety of acts including breaches of fiduciary duty, forgery, theft, diversion and a cover up, neither the dividends, totaling $19,823,250.00, nor the 2,531,250 shares have ever been delivered to Miele III.  In 2014 the 2,531,250 shares paid dividends of over $2.5 million.

## III.     Mayflower Securities and Its Progeny

51.     Mayflower Securities, the firm owned by Mulvihill that had underwritten conducted Franklin's IPO, already had experienced numerous regulatory issues with the SEC by the time of Franklin's IPO.

52.     In the 1960's, Eugene Mulvihill was President and owner of Mayflower, a licensed broker-dealer with its principal place of business in New York, and significant operations in New Jersey.  In 1969, Mulvihill hired 24-year-old accountant Robert Brennan as a salesman for Mayflower.  Brennan virtually immediately set national sales records.  He was promoted, and by 1971, he had already become the President of Mayflower and headed their "investment banking" efforts.

53.     Brennan's meteoric rise to the top of Mayflower had not gone unnoticed by regulators, however, and by March of 1971, Brennan had already been suspended from the industry by the New Jersey Bureau of Securities for a month.

54.     A few months later, in August, Brennan assisted Mulvihill and Mayflower in selling Franklin's IPO.

55.     By the spring of 1974, the SEC had accused Mayflower of stock manipulation and fraud. One claim alleged that Mayflower sold stock of an electronics company without telling its clients the company was bankrupt, and another allegation involved falsely inflating the stock price of a company called Management Dynamics before selling the stock to the public.

**A.      Brennan Establishes a Relationship with Alleged Drug Trafficker Harold Derber and Opens First Jersey**

56.     Mayflower was close to financial collapse when Brennan was given an unsecured loan of $250,000 by Harold Derber. It has been reported that Derber was one of the largest traffickers of illegal marijuana in the United States according to Miami homicide files. Approximately six months after providing this loan, Derber was arrested for allegedly possessing 3,000 pounds of marijuana he was loading on to a truck. Derber also made a deal with Fidel Castro to ferry Cuban exiles into the United States. Despite these facts, Brennan claimed in an interview after Derber's assassination that he knew nothing of Derber's illegal businesses.

57.     Brennan apparently used the money to purchase the majority of the assets of Mayflower, which Brennan then used to open First Jersey Securities, Inc. ("First Jersey"). As a result of the SEC investigation, Mayflower had been suspended for 15 days. However, on November 11, 1974, the day Mayflower's suspension was to start, Brennan opened under the name First Jersey, effectively avoiding the sanction. Coincidentally, Miele Jr. was buried on the same day.

58.     Derber's relationship with Brennan continued at First Jersey, where the two established a lucrative financial relationship.  According to Justice Department investigative reports, Derber used First Jersey to launder money he allegedly received from drug sales. Federal records also show Brennan sold stock to Derber at prices far lower than the price later offered to the public, allowing Derber to make hundreds of thousands of dollars in profits.

59.     The Brennan/Derber relationship was cut short in 1976 during an SEC investigation of Derber's relationship with First Jersey.  On March 22, 1976, the night before Derber was expected to testify before the SEC, Derber was struck in the back by eight bullets. One of the bullets, lodged at the base of Derber's brain, was etched with his initials, leading to the conclusion that he had been assassinated and was not the victim of a random murder.  Since his body was found next to his Porsche, which was not stolen, the motives appeared to be clearly something other than theft.  The assassin(s) were never found.

60.     First Jersey's business "model" was hardly distinguishable from Mayflower's. Brennan hired Anthony Nadino, who had been sanctioned by the SEC for manipulating the price of the stock of Management Dynamics, the same allegation made against Mayflower.  In 1979, the SEC brought an action against Nadino for issuing fictitious stock prices, this time at First Jersey.

61.     Brennan also hired Robert Berkson, who was under a court injunction for securities fraud at the time.  In 1976, Berkson was convicted on eight counts of criminal securities violations, including forging documents in order to transfer stock illegally which was being held "in trust" for customers.

62.     Investigations of First Jersey were hindered by the mysterious disappearance of numerous records.  In 1980, an entire filing cabinet of First Jersey's financial records was

removed from the SEC's New York office, delaying proceedings for two years.  In 1985, 20,000 pages of documents pertaining to a stock manipulation investigation by the National Association of Securities Dealers disappeared from the agency's Manhattan office, and files and computer disks related to an investigation were reported missing from the SEC's Arlington, Virginia office.

63.     Despite this, in 1979 and 1983, the SEC filed complaints against First Jersey for allegedly participating in stock manipulation schemes.  In 1985, the SEC charged Brennan and First Jersey with securities fraud.

### B.     Mulvihill and Brennan's Partnership Continues

64.     While Mulvihill and Brennan no longer worked for the same company, they still maintained very close ties.  In 1974, Mulvihill became chairman of Vernon Valley Recreation Association, a ski resort company in which Brennan had a substantial interest.

65.     In 1981, First Jersey underwrote and sold to its customers $3.5 million in bonds for Vernon Valley.  After the company changed its name to Great American Recreation ("Great American") in 1981, First Jersey raised $4.1 million for one of its subsidiaries.

66.     Mulvihill continued to have well publicized legal problems after Mayflower.  In March 1983, the New Jersey State Commission on Investigation held public hearings on alleged violations involving Great American's lease with the State for the Vernon Valley ski area.

67.     In April of 1984, a grand jury issued an indictment containing over 100 counts against Mulvihill, Great American, Vernon Valley and its officials, and seven other corporations controlled by Mulvihill and his associates.  Mulvihill pled guilty to multiple counts, including the forging of bonds, fabricating an insurance company in the Cayman Islands, and then using this fabricated company to provide a purported insurance policy for his amusement parks.

68.    In 1986, after the SEC reviewed his criminal convictions, Mulvihill was barred for life from the securities industry.

69.    Despite the convictions, First Jersey continued to recommend investment in Great American, and in December 1986 it sold its customers a new issue of Great American bonds totaling $5.75 million.   First Jersey's report on the company did not mention the criminal convictions.

70.    In 1986, under the shadow of a federal grand jury investigation alleging numerous crimes ranging from stock fraud to campaign contribution violations and defrauding customers of $9.6 million, Brennan sold First Jersey's retail sales division, including its offices, employees and customers, to Sherwood Capital Group ("Sherwood").   John E. Dell, then president of First Jersey, became Head of Retail at Sherwood, and former New Jersey U.S. Attorney W. Hunt Dumont, Executive Vice President and General Counsel for First Jersey, assumed those same positions at Sherwood.    Frederick A. Eyerman, former Vice President and Director of Compliance for First Jersey, then moved on to Sherwood—he was subsequently arrested in 1987 for obstruction of justice.

71.    In 1988, as regulators closed in again, Sherwood's assets were sold to another company, F.N. Wolf & Co. ("FN Wolf"), which was run by Franklin Wolf.   FN Wolf was financed by Brennan and had so many former Brennan brokers that regulators dubbed it 'First Jersey II.'   Brennan continued to use FN Wolf and other firms to sell stock at inflated prices which he had purchased for only pennies.

72.    After a long series of investigations, Brennan was convicted of money laundering in July 2001 and sentenced to just under twelve years in prison.

**IV.**   <u>**Franklin Correspondence Addressed to Miele Jr. is Returned**</u>

73.    Miele III had not been receiving correspondence from Franklin, and apparently dividend checks were returned to the Bank of New York.  On July 21, 1989, Harmon E. Burns, then Secretary of Franklin, wrote to Richard Hanrahan, an Assistant Treasurer at the Bank of New York ("BoNY"), stating that written correspondence addressed to "Anthony P. Miele Jr.," at that point deceased almost fifteen years, had been returned by the post office.

74.    On February 1, 1990, Burns again wrote to Hanrahan at BoNY, enclosing proxy cards which had been mailed to shareholders, on which shareholders were supposed to indicate a change of address.  Burns also enclosed envelopes which had been returned by the post office, and asked Hanrahan to take appropriate steps to ascertain or verify correct new addresses for those shareholders.  Burns enclosed the returned envelope in the correspondence to Hanrahan, which was addressed to "Anthony P Miele Jr. TTEE Anthony P  Miele III."

75.    On March 4, 1991, Hanrahan wrote to Burns regarding the account of "Anthony P. Miele Jr. Trustee Anthony P. Miele III," stating that the account contained outstanding dividend checks from January 13, 1984 through January 15, 1991 totaling $186,496.88, and that 128,125 Franklin shares were held for the account in the BoNY vaults.  Hanrahan stated that their records reflected 12,500 shares held by the shareholder for a total shareholder position of 140,625 shares.  BoNY had on file the 160 South Livingston Avenue address, and the Social Security number of Miele III. Hanrahan stated that BoNY would be happy to assist Franklin in locating Mr. Miele.

76.    According to conversations with Johnson, Johnson received a report from BoNY, and was told that the shares and dividends in the Miele account were going to be escheated to the State of New Jersey, because correspondence had been returned to the company.  Johnson believes this took place between 1986 and 1989.  Based on an August 8, 1991 notice sent to

Burns from Hanrahan explaining how property would then be escheated to the State, and BoNY's retention of Miele III's property in 1991, these dates could be off by several years.

77.     Johnson and Franklin had been in possession of Miele III's Social Security number since 1973 and at all points thereafter.  Johnson and Franklin did not use this information or the resources offered by BoNY to locate Miele III.

78.     At this point, Johnson was a member of the Board of the National Association of Securities Dealers ("NASD"), and the next year, in 1992, became Chairman of the Board of Governors of the NASD.

79.     According to Johnson, then President and Chief Executive Office of Franklin, when he learned that the Miele shares and dividends would be escheated to the State of New Jersey, he contacted Eugene Mulvihill, who was present at the sole meeting of Miele Jr., Johnson and Brennan, in order to locate Miele Jr.

80.     As set forth above, Mulvihill's company had been accused of stock manipulation and fraud, an employee of his business partner's company had been convicted of forging documents to illegally transfer stock which was held in trust for customers, Mulvihill had been convicted of numerous crimes including forgery, and had been barred from the securities industry for life. The nefarious acts of Mulvihill, Brennan and their companies, and the investigations and proceedings of state and federal agencies had been well-publicized by the news media.

81.     According to Johnson, he called Mulvihill, a man who, in addition to his frauds and convictions, was in no way associated with Franklin.  According to Johnson, he then learned for the first time that Miele Jr. had died.  Johnson delegated to Mulvihill the responsibility for

ensuring that what was then almost $5,000,000 in stock was delivered to Miele III. Mulvihill informed Johnson that "he would take care of it."

82.     Miele III never received the stock or dividends held by BoNY or Franklin.  On June 17, 1991, an application for a replacement share certificate was submitted for the 5,000 share certificate NU-6580.  These shares and future dividends were subsequently directed to FN Wolf, the successor to the assets of Mayflower and First Jersey.

83.     Mulvihill never mentioned these conversations regarding the Franklin stock and dividends to Miele III.

## V.     Miele III's Dividends and Shares of Franklin are Illegally Transferred

84.     On October 17, 1991, Harmon Burns, Franklin Secretary and member of the Franklin Board of Directors, received a call from Richard Hanrahan of BoNY.  Burns took notes of the call, saying "He [Hanrahan] is puzzled why it does not show up in the system that the certificates were released to someone between the Mar[ch] '91 letter and the 9/91 and 10/91 trades. He will investigate further. He will be sending a letter to the address of record to see if he can get some reaction."

85.     The release and transfer of these shares was not authorized by Miele III, a legal adult at the time.

86.     On October 24, 1991, BoNY sent a letter to Anthony P. Miele, Jr., deceased for over fifteen years at that point, at 160 South Livingston Avenue, copying Harmon Burns, saying Hanrahan was advised to contact Miele Jr. regarding past dividends held by the bank.

87.     Whereas in March 1991 BoNY identified a shareholder position of 140,625 shares for Miele III, as of December 20, 1991, Franklin listed the shareholder position of Anthony P Miele Jr TTEE Anthony P Miele III as 13,750 shares.

88.     On January 16, 1992, certificate number NU-6580 was cancelled, and a replacement certificate was issued.  As of December 22, 1992, neither Miele Jr. nor Miele III appeared on the Franklin shareholder list.

89.     According to Johnson, he recalled seeing in 1992 the stock transferred to street name.  According to records, at some point the dividend payment address for the BoNY account was changed to FN Wolf & Co. Inc., 110 Wall Street, 23rd floor, New York, NY 10005-3836.

90.     F.N. Wolf & Co. Inc. ("F.N. Wolf") was the company which emerged at the end of the investigations, closings, and sale of Mayflower Securities and First Jersey, which were run by Gene Mulvihill and Robert Brennan.  The owner of FN Wolf, Frank Wolf, was a friend of Brennan and Mulvihill's.  After an SEC investigation resulting in fines, FN Wolf went out of business in December 1994 after filing for bankruptcy.

91.     Some dividends were turned over to the State Street Bank and Trust Company Unclaimed Property Clearinghouse System ("Clearinghouse"), which was used when property would escheat to the State.   According to a report run on March 11, 1993, the Clearinghouse held $25,200 in dividends in the name of Miele III, however a notation states that these shares were cancelled on May 5, 1992.

92.     According to Johnson, "whenever" he would see Mulvihill in Nantucket, where both spent numerous summers, Mulvihill would say to Johnson that "the Miele children [would] never forget what [Johnson] did for them," implying that through Mulvihill's efforts, the Mieles had received the stock.  These conversations occurred as recently as the summer of 2012, months before Mulvihill's death.

93.     Harmon Burns, then Vice Chairman of Franklin, died on November 8, 2006.

94. The last reported activity on the Miele III BoNY account was listed as March 26, 2008. On information and belief, after the merger of The Bank of New York Company, Inc. and Mellon Financial Corporation in 2007, the topic of Miele III's account and these shares came up, and an investigation was conducted in 2008. Outside attorneys questioned BoNY, now Computershare, employees including Hanrahan, regarding communications with Burns regarding the Miele III shares.

95. At no point during this investigation was Miele III ever contacted regarding his shares or dividends in Franklin.

## VI. Miele III Learns of the Franklin Stock

96. In 2012, a picture of Veronica Miele Beard, sister to Miele III, was published in the book "A Life In Full Sail," which was authored by Veronica's father in law, Anson M. Beard, Jr. ("Beard Jr."). On August 16, 2012, Johnson called Beard Jr. and asked whether the Veronica Miele pictured in his book was "the daughter of the Anthony Miele who went to Lehigh in the 1950's." Beard Jr., after calling his daughter-in-law, Veronica Miele Beard, notified Charlie by phone that she was. Johnson expressed the hope that the Miele children had received the Franklin stock. Beard Jr. asked Veronica about this stock, but, never having heard of it, she replied that neither she, nor any member of her family had received any Franklin stock.

97. Johnson mailed Beard Jr. a page from a ledger of BoNY, dated January 21, 1974, showing 4,000 Franklin Resources shares registered in the name of Anthony P. Miele Jr. Trustee for Anthony P. Miele III, with a handwritten notation saying "voted."

98. Veronica called Miele III and said Johnson wanted Mulvihill's phone number. Miele III provided Veronica with Mulvihill's office number. Soon after, Mulvihill called Miele III multiple times. When Miele III answered, Mulvihill asked why Johnson had called Mulvihill and what the Mieles had told Johnson about the Franklin stock. Miele III asked Mulvihill what

he was talking about, as he was not aware of any stock. Mulvihill said, "the money I gave you in 1990." Miele III stated that Mulvihill had never told him the source of that money, but had said that "your father [Miele Jr.] had done a lot of deals and [Mulvihill] will tell you [Miele III] about it when you are forty."

99.     On August 21, 2012, Miele III called Mulvihill on his cell phone. Mulvihill stated that he "was with a friend of [Miele III's] father," which was Brennan. Mulvihill said "I can't talk." On August 24, 2012, Miele III called Mulvihill, who said "I'm at Nantucket airport and can't talk, I'm going to meet Charlie [Johnson] about the Franklin stock."

100.    According to Miele III, on October 17, 2012, Miele III spoke with Mulvihill and said Mulvihill needed to explain what had happened with the Franklin stock. Mulvihill met Miele III, and said that mail kept being returned to Johnson regarding the Franklin stock. Johnson had contacted Mulvihill, who said he would take care of it. Mulvihill then contacted one of his business partners, John Steinbach, who "signed something" for Mulvihill. In conversations with Steinbach, Steinbach admitted to signing a document in Miele III's name. Mulvihill said that J.P. Miele had cashed all of the dividends, and that if Miele III ever investigated this matter, Robert Brennan "would hire a Russian hit man to kill [Miele III] and your family."

101.    Ten days later, on October 27, 2012, Mulvihill died of a heart attack at the age of 78.

102.    Miele III and Veronica Miele attended Mulvihill's funeral, where they saw Robert Brennan and Franklin Wolf. James "Jimmy" Mulvihill, one of Gene Mulvihill's sons, told Veronica Miele that Mulvihill had told him about the Franklin stock, but declined to elaborate further.

22

103.    On August 22, 2013, Miele III received a call from John Steinbach asking Miele III to play in a memorial golf outing for Mulvihill.  Steinbach said that Mulvihill was so good to Miele III, that Mulvihill "got money" for Miele III, and that Mulvihill had come to Steinbach and Steinbach had signed something in Miele III's name.  Steinbach said that Mulvihill had told Steinbach that it was needed to get money for Miele III.  At the golf outing in September 2013, Steinbach said that Miele III "ought to leave things from the past alone," that people "did a lot of things back then that they don't want brought back up," and that Steinbach had "signed things he didn't want to sign."

104.    In an email on February 19, 2014, copying Franklin General Counsel Craig Tyle and Corporate Secretary Maria Gray, in response to a request for shareholder lists from meetings in 1973-1975, Johnson denied that such shareholder records existed, saying that "[t]here are no ledgers or books from the [shareholder] meetings."  Apparently, only that single page 9 of the March 1974 Shareholder meeting list had survived and, for some reason, had been maintained by Johnson.

105.    As an aside, while Johnson, Franklin and Computershare had initially cooperated in this investigation, all cooperation ceased when documents concerning an earlier 2008 "investigation" into the Miele III shares were requested.  That "investigation" remains completely mysterious.  Its existence was revealed in a telephone call with Richard Hanrahan in 2014, but there are no details whatever about it, its results, who conducted it or anything other than "lawyers were all over this."  Indeed, from that point Miele III was told he would require a subpoena to obtain that information.

106.    It was not until March 21, 2014, that Miele III came into the possession of documents revealing the shares and dividends that had been held by BoNY on March 4, 1991,

the communication that occurred between BoNY and Franklin Secretary Harmon Burns regarding these shares, and that, without his authorization, his shares and dividends had been transferred in September and October 1991.

107.    At the January 8, 2015 share price of approximately $54, the total value of the stock would be $136,687,500.  Including the issued dividends, without interest, the value would be $156,505,850.  In 2014 the 2,531,250 shares paid dividends of over $2.5 million.

## FIRST CLAIM
### (Breach of Fiduciary Duty against Charles B. Johnson)

108.    Miele III repeats and realleges all of the allegations contained herein, as if specifically set forth herein.

109.    From March 1973 to December 1992, Miele III was a Franklin shareholder. During this time period, Johnson was President, Chief Executive Officer, and Chairman of the Board of Franklin.

110.    As an officer and director of Franklin, Johnson had a fiduciary duty of due care, good faith and loyalty to Franklin, and Miele III as a shareholder.

111.    Johnson breached that duty when he delegated to Eugene Mulvihill, a man who was convicted of forgery and barred from the securities industry, and in no way affiliated with Franklin, the responsibility of ensuring that Miele III received millions in unclaimed shares and dividends.

112.    As a result of Johnson delegating this responsibility to Mulvihill, Miele III's shares and dividends were illegally transferred, resulting in a loss to Miele III in excess of $156,505,850.

### SECOND CLAIM
### (Negligence against Charles B. Johnson)

113.    Miele III repeats and realleges all of the allegations contained herein, as if specifically set forth herein.

114.    From March 1973 to December 1992, Miele III was a Franklin shareholder. During this time period, Johnson was President, Chief Executive Officer, and Chairman of the Board of Franklin.

115.    Johnson had a duty to exercise care in performing his duties as an Executive of Franklin.

116.    Johnson delegated to Eugene Mulvihill, a man who was convicted of forgery and barred from the securities industry, and in no way affiliated with Franklin, the responsibility of ensuring that Miele III received millions in unclaimed shares and dividends.

117.    Johnson knew or should have known about Mulvihill's convictions and acts of fraud and dishonesty.

118.    Johnson's delegation of this responsibility to Mulvihill was negligent, and caused Miele III's shares and dividends to be illegally transferred, resulting in a loss to Miele III in excess of $156,505,850.

### THIRD CLAIM
### (Fraudulent Concealment against Charles B. Johnson and Franklin Resources, Inc.)

119.    Miele III repeats and realleges all of the allegations contained herein, as if specifically set forth herein.

120.    At all relevant times Johnson and Burns were acting as agents of Franklin.

121.    At all times after the illegal transfer of Miele III's dividends and shares of Franklin in 1991, Johnson and Burns were aware that these shares and dividends were the

property of Miele III, that the property of Miele III had been illegally transferred, that Johnson had delegated the responsibility for delivering these shares to Eugene Mulvihill and later, in 2008, Johnson was aware that an investigation had been conducted into Miele III's shares and dividends.

122.    These are material facts which would have informed Miele III that he had been injured.

123.    Despite this knowledge, and an investigation in 2008 into these facts, Johnson suppressed or concealed these facts from Miele III, with the intention that Miele III be misled as to his dividends and shares in Franklin.

124.    Miele III was misled regarding these shares and dividends of Franklin.  Miele III has suffered damages as a result of this concealment in excess of $156,505,850.

**FOURTH CLAIM**
**(Negligent Prevention of Assistance against Charles B. Johnson and Franklin Resources, Inc.)**

125.    Miele III repeats and realleges all of the allegations contained herein, as if specifically set forth herein.

126.    At all relevant times Johnson and Burns were acting as agents of Franklin.

127.    On March 4, 1991, Richard Hanrahan wrote to Harmon Burns, saying "[w]e at the Bank will be happy to assist Franklin Resources in locating Mr. [Anthony P.] Miele [Jr.].  Please contact me if you have any further question or requests."

128.    The actions of Charles Johnson and Harmon Burns prevented Hanrahan from taking action to locate Miele III, and instead Johnson delegated to Eugene Mulvihill the responsibility of ensuring that Miele III received millions in unclaimed shares and dividends.

129.    Johnson and Burns realized or should have realized that Hanrahan's assistance was necessary for the aid or protection of Miele III, to prevent the loss of his dividends and shares of Franklin.

130.    By preventing Hanrahan from locating Miele III, Johnson and Burns allowed for the illegal transfer of Miele III's Franklin shares and dividends.

131.    The actions of Johnson and Burns caused damages to Miele III in excess of $156,505,850.

### FIFTH CLAIM
### (Wrongful Registration under Cal. Comm. Code § 8404 against Franklin Resources, Inc.)

132.    Miele III repeats and realleges all of the allegations contained herein, as if specifically set forth herein.

133.    Franklin Resources, Inc. is an Issuer under Cal. Comm. Code § 8201.

134.    On March 4, 1991, Miele III's total position in Franklin stock was 140,625 shares. BoNY held stock certificates in their vaults for Miele III representing 128,125 shares of Franklin.

135.    Between March 4, 1991 and September 1991, these shares were transferred to an unknown individual.

136.    On January 16, 1992, BoNY cancelled share certificate number NU-6580, and issued a replacement share certificate to an unknown individual.

137.    These shares were registered to someone other than Miele III.  By December 22, 1992, Miele III did not appear on the Franklin shareholder list.

138.    Neither Miele III nor his legal representative completed an endorsement or instruction authorizing the issuance of a replacement share certificate, or the transfer of the shares held by BoNY.

139.     As such, these shares were wrongfully registered pursuant to an ineffective endorsement or instruction, and Franklin must provide Miele III with the securities and distributions he did not receive as a result of this wrongful registration.

### SIXTH CLAIM
### (Replacement of lost, destroyed, or wrongfully taken security certificate under Cal. Comm. Code § 8405 against Franklin Resources, Inc.)

140.     Miele III repeats and realleges all of the allegations contained herein, as if specifically set forth herein.

141.     On March 4, 1991, BoNY stated that Miele III's total position in BEN stock was 140,625 shares.  BoNY held stock certificates in their vaults representing 128,125 shares.

142.     Based on stock splits, today the above would represent 2,531,250 shares of Franklin Resources, Inc.

143.     After learning of the existence of these shares, Miele III promptly informed Franklin that the shares were lost or stolen.

144.     New stock certificates have not been issued by either Franklin, or its current transfer agent Computershare, to replace the stock certificates which were lost or stolen.

WHEREFORE, while reserving the right to seek additional damages as available, Plaintiff demands judgment against Defendants as follows:

A.      The reissuance of the shares of Franklin Resources, Inc. to which Mr. Miele is entitled, which, at the time of filing, is 2,531,250 shares;

B.      Alternatively, the present value of the 2,531,250 shares of Franklin Resources, Inc.;

C.      All compensatory damages, including but not limited to dividends exceeding $19,823,250;

D.      Attorneys' fees and costs;

E.      Pre-judgment and post-judgment interest;

F.      All such other and further relief as this Court deems just and proper.

Dated:          January 14, 2015


                                LIDDLE & ROBINSON, L.L.P.


                                By:___/s/ David M. Marek_____
                                        David M. Marek
                                        Of Counsel:
                                        Jeffrey L. Liddle*
                                        Caitlin D. Brown*
                                Liddle & Robinson, L.L.P.
                                800 Third Avenue
                                New York, NY 10022
                                Tel: (212) 687-8500
                                Fax: (212) 687-1505
                                jliddle@liddlerobinson.com

                                *Not admitted in the Northern
                                District of California