1

2

3

4

5

6

7

8  UNITED STATES DISTRICT COURT

9  NORTHERN DISTRICT OF CALIFORNIA

10  SAN FRANCISCO DIVISION

11  San Francisco Division

12

<table>
<tr><td>13</td><td>ANTHONY P. MIELE, III,</td><td>Case No. 3:15-cv-00199-LB</td></tr>
<tr><td>14</td><td>Plaintiff,</td><td rowspan="4"><strong>ORDER GRANTING IN PART AND DENYING IN PART THE DEFENDANTS' MOTION TO DISMISS MR. MIELE III'S FIRST AMENDED COMPLAINT</strong></td></tr>
<tr><td>15</td><td>v.</td></tr>
<tr><td>16</td><td>FRANKLIN RESOURCES, INC., et al.,</td></tr>
<tr><td>17</td><td>Defendants.</td></tr>
</table>

[Re: ECF No. 19]

18  **INTRODUCTION**

19      In this diversity case, the plaintiff, Anthony P. Miele III, sued Franklin Resources, Inc.

20  ("Franklin Resources"), an investment management organization, and its former President, Chief

21  Executive Officer, and Chairman of the Board, Charles Johnson, for claims arising out of Franklin

22  Resources's and Mr. Johnson's alleged failure to safeguard Mr. Miele III's shares of Franklin

23  Resources that he asserts were transferred in the 1990s without his consent and that now would be

24  worth approximately $136,000,000. (First Amended Complaint ("FAC"), ECF No. 17 ¶ 28.[1]) The

25  defendants assert that Mr. Miele III's claims are meritless and time-barred and move to dismiss

26  them. (Motion, ECF No. 19.) The court grants in part and denies in part their motion.

27  _____

28  [1] Record citations are to documents in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the tops of the documents.

**STATEMENT**

## I. MR. MIELE III'S ALLEGATIONS

### A. Mr. Miele III Acquires Shares of Franklin Resources

Franklin Resources was founded by Mr. Johnson's father in November 1947. (FAC ¶ 28.) In 1957, Mr. Johnson became Franklin Resources's President and Chief Executive Officer. (*Id.* ¶ 29.)

Years later, to expand the company, Mr. Johnson raised capital through an initial public offering ("IPO"). (*Id.*) Mr. Johnson engaged Mayflower Securities ("Mayflower"), which was owned by Eugene Mulvihill, to underwrite the IPO. (*Id.* ¶ 31.) On August 6, 1971, Franklin Resources sold 120,000 shares of common stock in its IPO for $5.00 per share. (*Id.*) In 1972, Franklin Resources used the capital raised from the IPO to acquire Winfield & Co. Inc. ("Winfield"), an investment firm with nearly twice the assets of Franklin Resources. (*Id.* ¶ 33.)

Despite the expansion, Franklin Resources struggled financially in 1972 and 1973. (*Id.* ¶ 36.) In 1973, Mr. Johnson contacted Mr. Mulvihill to obtain a loan. (*Id.* ¶ 37.) Mr. Mulvihill, apparently with the assistance of Mayflower's President, Robert Brennan, informed Mr. Johnson that they could arrange for Mr. Mulvihill's friend (and Mr. Miele III's father), Anthony Miele Jr., to make the loan. (*Id.*) In 1973, Mr. Miele Jr. was the controlling shareholder of both PCI International, Inc., and Pollution Control Industries, Inc., which were located at One Fairfield Crescent, West Caldwell, New Jersey, and was part owner of Modern Transportation Co. and A & S Transportation Co., which were located at 75 Jacobus Avenue, South Kearny, New Jersey. (*Id.* ¶ 39.) All of Mr. Miele Jr.'s companies were involved in the waste-management and sludge business in New Jersey and the Philadelphia metropolitan area. (*Id.*)

Mr. Miele Jr. loaned $100,000 to Franklin Resources at a meeting attended by Mr. Miele Jr., Mr. Johnson, Mr. Mulvihill, and Mr. Brennan. (*Id.* ¶ 41.) According to Mr. Johnson, the loan proceeds were used to solidify the Winfield acquisition. (*Id.*) No documentation of that loan appears to exist, but Mr. Johnson has stated that the loan was made pursuant to a promissory note and listed on the public books and records of Franklin Resources as part of its capital structure. (*Id.* ¶ 42.)

Mr. Miele Jr. received 4,000 shares of Franklin Resources as a "bonus" for making the loan.

United States District Court
Northern District of California

(*Id.*) The stock certificate for the 4,000 shares of Franklin Resources was numbered NU-02763 and dated March 15, 1973 and reflected that the shares were owned by "Anthony P. Miele Jr. TTEE Anthony P. Miele III," a trust formed no later than September 28, 1972, for the benefit of Mr. Miele III, who was two or three years old at the time. (*Id.* ¶¶ 5, 21, 44.) The stock certificate was "stamped to show restrictions on transfer." (*Id.* ¶¶ 44, 116.) On March 15, 1973, the shares were valued at approximately $100,000. (*Id.* ¶ 44.) Franklin Resources's records also indicate that the shares were owned by "Anthony P. Miele Jr. TTEE Anthony P. Miele III" and that the shares were "voted" at a Franklin Resources's shareholders' meeting on March 21, 1974. (*Id.* ¶ 45.) The address of record for the voted shares was Modern Transportation Co., 75 Jacobus Avenue, South Kearny, New Jersey 07032. (*Id.*)

On November 8, 1974, Mr. Miele Jr. died at age 39. (*Id.* ¶ 46.) He was survived by his wife, Evelyn, and three children, Mr. Miele III (three), Veronica (two), and Matthew (nine months). (*Id.*) After Mr. Miele Jr.'s death, the 4,000-share stock certificate numbered NU-02763 was held by McCarter & English, LLP, the law firm representing the Miele Jr. Estate, either in a safety deposit box opened for the Miele Jr. Estate, or at the firm's offices, until the windup of the Miele Jr. Estate in 1983. (*Id.* ¶ 47.)

Over time the 4,000 shares paid dividends, and additional shares were issued in the name of "Anthony P. Miele Jr. TTEE Anthony P. Miele III" due to stock splits. (*Id.* ¶ 48.) The first stock split, a 5-for-4 split, resulted in a 1,000-share stock certificate's being issued to "Anthony P. Miele Jr. TTEE Anthony P. Miele III" on April 7, 1982. (*Id.*) (This brings the total shares owned by "Anthony P. Miele Jr. TTEE Anthony P. Miele III" to 5,000.) This stock certificate bore a stamp reading "[t]he shares represented by this certificate have not been registered under the Securities Act of 1933, as amended. The shares have been acquired for investment and may not be sold, transferred or assigned in the absence of an effective registration statement for these shares under the Securities Act of 1933 as amended, or an opinion of the Company's counsel that registration is not required under said Act." (*Id.*)

By March 4, 1991, after more stock splits, The Bank of New York ("BoNY"), the transfer agent for Franklin Resources, held $186,496.88 in uncashed dividend checks for the "Anthony P.

Miele Jr. TTEE Anthony P. Miele III" account, "stock certificates in [its] vaults represent[ed] 128,125 shares," and its "records reflect[ed] 12,500 shares held by the shareholder" for a "total position [of] 140,625 [shares]." (*Id.* ¶ 49.) Due to more stock splits since March 4, 1991, the 140,625 shares in 1991 have become 2,531,250 shares of Franklin Resources today. (*Id.* ¶ 50.) Additional dividends issued after March 4, 1991 total $20,202,937.63 as of April 20, 2015. (*Id.*) Based on the January 8, 2015 closing share price of approximately $54.00, the total value of the shares exceeds $136,000,000. (*Id.*; *see also id.* ¶ 118.) Neither the $20,202,937.63 in dividends nor the 2,531,250 shares has ever been delivered to Mr. Miele III. (*Id.* ¶ 51; *see also id.* ¶ 118.)

Mr. Miele III had not been receiving correspondence from Franklin Resources, and apparently the dividend checks were returned to BoNY. (*Id.* ¶ 74.) On July 21, 1989, Harmon E. Burns, then Secretary of Franklin Resources, wrote to Richard Hanrahan, an Assistant Treasurer of BoNY, stating that written correspondence addressed to "Anthony P. Miele Jr.," who by that time had been deceased for almost fifteen years, was returned by the post office. (*Id.*) The next year, on February 1, 1990, Mr. Burns again wrote to Mr. Hanrahan because some of the proxy cards that had been addressed and mailed to Franklin Resources's shareholders were returned by the post office. (*Id.* ¶ 75.) Mr. Burns asked Mr. Hanrahan to take appropriate steps to ascertain or verify correct new addresses for the shareholders whose proxy cards had been returned. (*Id.*) Among those returned was the proxy card addressed and mailed to "Anthony P. Miele Jr. TTEE Anthony P. Miele III." (*Id.*) About one month later, on March 4, 1991, Mr. Hanrahan replied to Mr. Burns. (*Id.* ¶ 76.) He stated that the address that BoNY had on file for "Anthony P. Miele Jr. TTEE Anthony P. Miele III" was the 160 South Livingston Avenue address. (*Id.*) He also stated that the Social Security number related to the account was that of Mr. Miele III. (*Id.*) Additionally, Mr. Hanrahan stated that the "Anthony P. Miele Jr. TTEE Anthony P. Miele III" account contained outstanding dividend checks from January 13, 1984 through January 15, 1991 totaling $186,496.88, and that 128,125 shares of Franklin Resources were held for the account in BoNY's vaults. (*Id.*) He further stated that BoNY's records reflected that "Anthony P. Miele Jr. TTEE Anthony P. Miele III" also held 12,500 additional shares, thus bringing the total shares owned to 140,625. (*Id.*) Finally, Mr. Hanrahan told Mr. Burns that BoNY would be happy to help Franklin

4

1   Resources locate Mr. Miele III. (*Id.*) Nevertheless, neither Franklin Resources nor Mr. Johnson

2   used their information or BoNY's resources to locate Mr. Miele III. (*Id.* ¶ 78.)

3   　　Mr. Johnson recollected that, at some point, he received a report from BoNY telling him that

4   the shares and dividends in the "Anthony P. Miele Jr. TTEE Anthony P. Miele III" account would

5   escheat to the State of New Jersey because correspondence had been returned as undeliverable.

6   (*Id.* ¶ 77.) This recollection is supported by an August 8, 1991 notice in which Mr. Hanrahan

7   explains to Mr. Burns when property would escheat to the State. (*Id.*) When Mr. Johnson learned

8   that the shares and dividends owned by "Anthony P. Miele Jr. TTEE Anthony P. Miele III" would

9   escheat to the State of New Jersey, he contacted Mr. Mulvihill in an attempt to locate Mr. Miele Jr.

10  (*Id.* ¶ 80.) It was then that Mr. Johnson learned for the first time that Mr. Miele Jr. had died years

11  earlier. (*Id.* ¶ 82.) According to Mr. Miele III, Mr. Johnson then "delegated" to Mr. Mulvihill the

12  responsibility for ensuring that the shares were delivered to Mr. Miele III. (*Id.*) Mr. Johnson did

13  this despite the well-publicized facts that Mr. Mulvihill's company, Mayflower, had been accused

14  of stock manipulation and fraud, that Mr. Mulvihill had been convicted of numerous crimes,

15  including forgery, and had been barred from the securities industry for life, and that an employee

16  of his business partner's (Mr. Brennan's) company (First Jersey) had been convicted of forging

17  documents to illegally transfer stock which was held in trust for customers. (*Id.* ¶ 81; *see also id.*

18  ¶¶ 52-73.) Mr. Mulvihill told Mr. Johnson that "he would take care of it." (*Id.* ¶ 82.)

19  　　Mr. Mulvihill never mentioned these conversations regarding the Franklin Resources shares

20  and dividends to Mr. Miele III, and Mr. Miele III never received the stock or dividends held by

21  BoNY or Franklin Resources. (*Id.* ¶¶ 83-84.)

22  　　On June 17, 1991, an application for a replacement stock certificate was submitted to replace a

23  5,000-share stock certificate numbered NU-6580. (*Id.* ¶ 83.) These shares and the future dividends

24  were subsequently directed to FN Wolf & Co. Inc., the successor to the assets of Mayflower and

25  First Jersey. (*Id.*)

26  　　On October 17, 1991, Mr. Burns received a call from Mr. Hanrahan. (*Id.* ¶ 85.) Mr. Burns took

27  notes of the call, which state: "He [Mr. Hanrahan] is puzzled why it does not show up in the

28  system that the certificates were released to someone between the Mar[ch] '91 letter and the 9/91

United States District Court
Northern District of California

and 10/91 trades. He will investigate further. He will be sending a letter to the address of record to see if he can get some reaction." (*Id.*) On October 24, 1991, BoNY sent a letter to Mr. Miele Jr. at the 160 South Livingston Avenue address that said that Mr. Hanrahan was advised to contact Mr. Miele Jr. regarding past dividends held by the bank. (*Id.* ¶ 88.)

As of December 20, 1991, Franklin Resources listed "Anthony P. Miele Jr. TTEE Anthony P. Miele III" as owning only 13,750 shares. (*Id.* ¶ 89.) Just a few months earlier, in March 1991, BoNY had identified "Anthony P. Miele Jr. TTEE Anthony P. Miele III" as owning 140,625 shares. (*Id.*) On January 16, 1992, the 5,000-share stock certificate numbered NU-6580 was cancelled, and a replacement certificate was issued. (*Id.* ¶ 90.) As of December 22, 1992, neither Mr. Miele Jr. nor Mr. Miele III appeared on Franklin Resources's shareholder list. (*Id.*) And at some point, the dividend payment address for the BoNY account was changed to FN Wolf & Co. Inc. (the successor to Mr. Mulvihill's company, Mayflower), 110 Wall Street, 23rd floor, New York, NY 10005-3836. (*Id.* ¶ 91.) Some dividends were turned over to the State Street Bank and Trust Company Unclaimed Property Clearinghouse System ("Clearinghouse"), which was used when property escheated to the State. (*Id.* ¶ 93.) According to a report run on March 11, 1993, the Clearinghouse held $25,200 in dividends in the name of Mr. Miele III; however, a notation states that these checks had been cancelled on May 5, 1992. (*Id.*)

Mr. Miele III did not authorize the release and transfer of the shares. (*Id.* ¶ 86.) The initial 4,000-share stock certificate numbered NU-02763 and 1,000-share stock certificate were restricted, and the restriction on the 1,000-share stock certificate indicated that it could not be sold, transferred, or assigned in the absence of an effective registration statement or opinion of Franklin Resources's counsel that registration was not required under the Securities Act of 1933, as amended. (*Id.* ¶ 87.)

The last reported activity on the "Anthony P. Miele Jr. TTEE Anthony P. Miele III" BoNY account was listed as March 26, 2008. (*Id.* ¶ 96.) After the merger of The Bank of New York Company, Inc. and Mellon Financial Corporation in 2007, the topic of the "Anthony P. Miele Jr. TTEE Anthony P. Miele III" account came up, and an investigation was conducted in 2008. (*Id.* ¶¶ 96, 117.) Outside attorneys questioned employees of BoNY (now Computershare), including Mr.

Hanrahan, regarding communications with Mr. Burns about the shares. (*Id.* ¶¶ 8, 96.) At no point during this investigation was Mr. Miele III ever contacted regarding his shares or dividends of Franklin Resources. (*Id.* ¶ 97.)

**B. Mr. Miele III Learns about the Shares of Franklin Resources**

In 2012, a picture of Veronica Miele Beard, Mr. Miele III's sister, was published in the book "A Life In Full Sail," which was authored by Veronica's father-in-law, Anson M. Beard, Jr. (*Id.* ¶ 98.) Mr. Beard Jr. and Mr. Johnson became close friends when they were Vice Chairman and Chairman, respectively, of the Board of the National Association of Securities Dealers ("NASD") in 1992. (*Id.* ¶¶ 7, 10, 98.)

On August 16, 2012, Mr. Johnson called Mr. Beard Jr. and asked whether the Veronica Miele Beard pictured in his book was "the daughter of the Anthony Miele who went to Lehigh [University] in the 1950's." (*Id.* ¶ 98.) Mr. Beard Jr. told Mr. Johnson that Veronica was Mr. Miele Jr.'s daughter. (*Id.*) Mr. Johnson expressed the hope that the Miele children had received the shares of Franklin Resources given to Mr. Miele Jr. in 1973. (*Id.*) Mr. Beard Jr. asked Veronica about the stock, but, never having heard of it, she replied that neither she nor any member of her family had received any. (*Id.*) Mr. Beard Jr. informed Mr. Johnson that Veronica did not know about any stock. (*Id.* ¶ 99.) Mr. Johnson said he had traced the stock to a sale at Prudential and always wondered whether the Mieles got the stock. (*Id.*) Mr. Johnson asked Mr. Beard Jr. for Mr. Mulvihill's phone number to contact him. (*Id.*) Mr. Johnson subsequently mailed Mr. Beard Jr. a page from BoNY's ledger, dated January 21, 1974, showing 4,000 shares of Franklin Resources registered to "Anthony P. Miele Jr. TTEE Anthony P. Miele III," with a handwritten notation saying, "voted." (*Id.* ¶ 100.)

Veronica called Mr. Miele III and said Mr. Johnson had asked whether they had received Franklin Resources stock and that Mr. Johnson wanted Mr. Mulvihill's phone number. (*Id.* ¶ 101.) Mr. Miele III gave it to Veronica. (*Id.*)

Soon after, Mr. Mulvihill called Mr. Miele III multiple times. (*Id.*) When Mr. Miele III answered, Mr. Mulvihill asked Mr. Miele III why Mr. Johnson had called him [Mr. Mulvihill] and what the Mieles told Mr. Johnson about the Franklin Resources stock. (*Id.*) Mr. Miele III asked

United States District Court
Northern District of California

Mr. Mulvihill what he was talking about, as Mr. Miele III was not aware of any stock. (*Id.*) Mr. Mulvihill said: "The money I gave you in 1990." (*Id.*) Mr. Miele III stated that, in 1990, Mr. Mulvihill never told him the source of that money, and instead simply told him: "Your father [Mr. Miele Jr.] did a lot of deals and I [Mr. Mulvihill] will tell you [Mr. Miele III] about it when you are forty." (*Id.*)

A few days later, on August 21, 2012, Mr. Miele III called Mr. Mulvihill. (*Id.* ¶ 102.) Mr. Mulvihill stated that he was "with a friend of [Mr. Miele III's] father," which was Mr. Brennan, and that he "can't talk." (*Id.*) On August 24, 2012, Mr. Miele III again called Mr. Mulvihill, who said, "I'm at Nantucket airport and can't talk, I'm going to meet Charlie about the Franklin stock." (*Id.* ¶ 103.)

Mr. Miele III spoke with Mr. Mulvihill on October 17, 2012. (*Id.* ¶ 104.) He told Mr. Mulvihill that Mr. Mulvihill needed to explain what had happened with the Franklin Resources stock. (*Id.*) Mr. Mulvihill then met Mr. Miele III and told him that mail regarding the stock kept being returned to Mr. Johnson, so Mr. Johnson contacted him, and he told Mr. Johnson that he would take care of it. (*Id.*) After this, Mr. Mulvihill contacted one of his business partners, John Steinbach, who "signed something" for Mr. Mulvihill. (*Id.*) Mr. Mulvihill said that J.P. Miele (Mr. Miele Jr's brother and Mr. Miele III's uncle) cashed all of the dividends. (*Id.*) Mr. Mulvihill also said that if Mr. Miele III ever investigated this matter, Mr. Brennan "would hire a Russian hit man to kill you [Mr. Miele III] and your family." (*Id.*)

On October 27, 2012, ten days after Mr. Miele III's conversation with Mr. Mulvihill, Mr. Mulvihill died of a heart attack at age 78. (*Id.* ¶ 106.) Prior to Mr. Miele III's conversation with Mr. Mulvihill on October 17, 2012, Mr. Mulvihill never informed Mr. Miele III that he was entitled to any shares of Franklin Resources. (*Id.* ¶ 105.)

Mr. Miele III and Veronica Miele attended Mr. Mulvihill's funeral, where they saw Mr. Brennan and Franklin Wolf. (*Id.* ¶ 107.) James Mulvihill, one of Mr. Mulvihill's sons, told Veronica Miele that Mr. Mulvihill told him about the shares of Franklin Resources, but declined to elaborate further. (*Id.*)

Before the events of 2012, Mr. Miele III had never been informed that he was the beneficial

United States District Court
Northern District of California

owner of shares of Franklin Resources. (*Id.* ¶ 109.)

On August 22, 2013, Miele III received a call from John Steinbach asking Miele III to play in a memorial golf outing for Mr. Mulvihill in September 2013. (*Id.* ¶ 108.) Mr. Steinbach said that Mr. Mulvihill was "so good" to Mr. Miele III and "got money" for him. (*Id.*) Mr. Steinbach also said that Mr. Mulvihill came to him and that he [Mr. Steinbach] had signed something in Mr. Miele III's name. (*Id.* ¶¶ 104, 108.) Mr. Mulvihill told Mr. Steinbach that his signature was needed to get money for Mr. Miele III. (*Id.* ¶ 108.) At the golf outing the next month, Mr. Steinbach said that Mr. Miele III "ought to leave things from the past alone," that people "did a lot of things back then that they don't want brought back up," and that he had "signed things he didn't want to sign." (*Id.*)

After learning this information, Mr. Miele III retained counsel. (*Id.* ¶ 110.) His counsel spoke to Mr. Johnson and with Franklin Resources's General Counsel, Craig Tyle, and its Corporate Secretary, Maria Gray, in an attempt to discover what had become of the shares. (*Id.*) Mr. Miele III's counsel also contacted Computershare, the successor to BoNY's Shareowner Services business. (*Id.* ¶¶ 8, 110.) In an email (on which Mr. Tyle and Ms. Gray were copied) sent on February 19, 2014 and in response to a request for shareholder lists from meetings in 1973-1975, Mr. Johnson denied that such shareholder records existed, saying that "[t]here are no ledgers or books from the [shareholder] meetings." (*Id.* ¶ 113.) On March 21, 2014, Mr. Miele III received documents from Franklin Resources revealing the shares and dividends that had been held by BoNY on March 4, 1991, the communications that occurred between BoNY and Mr. Burns regarding these shares, and the transfer of the shares and dividends in September and October 1991. (*Id.* ¶ 114.) On April 16, 2014, Mr. Miele III came into the possession of files related to the Miele Jr. Estate, and those files revealed that no successor custodian had been appointed for the "Anthony P. Miele Jr. TTEE Anthony P. Miele III" trust. (*Id.* ¶ 115.)

## II. PROCEDURAL HISTORY

Mr. Miele III filed his Original Complaint on January 14, 2015. (Original Complaint, ECF No. 1.) On March 31, 2015, the defendants moved to dismiss it, arguing the his claims are barred by the applicable statutes of limitations and insufficiently pleaded. (Motion to Dismiss Original

1   Complaint, ECF No. 15.) In response, Mr. Miele III filed his First Amended Complaint as a matter

2   of right on April 21, 2015. (FAC, ECF No. 17.) In his First Amended Complaint, Mr. Miele III

3   brings the following claims: (1) breach of fiduciary duty by Mr. Johnson; (2) breach of fiduciary

4   duty by Franklin Resources; (3) negligence by Mr. Johnson; (4) fraudulent concealment by Mr.

5   Johnson and Franklin Resources; (5) negligent prevention of assistance by Mr. Johnson and

6   Franklin Resources; (6) wrongful registration of securities in violation of Delaware Code § 8-404

7   by Franklin Resources; and (7) replacement of lost, destroyed, or wrongfully taken security

8   certificate under Delaware Code § 8-405 by Franklin Resources. (FAC, ECF No. 17 ¶¶ 119-160.)

9       On May 14, 2015, the defendants filed a motion to dismiss the First Amended Complaint.

10   (Motion, ECF No. 19.) The court held a hearing on the matter on July 23, 2015. (7/23/2015

11   Minute Order, ECF No. 42.)

12                                    **ANALYSIS**

13   **I. LEGAL STANDARD**

14       Federal Rule of Civil Procedure 8(a) requires that a complaint contain a "short and plain

15   statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A

16   complaint must therefore provide a defendant with "fair notice" of the claims against it and the

17   grounds for relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation and

18   citation omitted).

19       A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) when it does

20   not contain enough facts to state a claim to relief that is plausible on its face. *See id.* at 570. "A

21   claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

22   the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

23   129 S.Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,'

24   but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting

25   *Twombly*, 550 U.S. at 557.). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss

26   does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his

27   'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the

28   elements of a cause of action will not do. Factual allegations must be enough to raise a right to

United States District Court
Northern District of California

1  relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations and parentheticals

2  omitted).

3      In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true

4  and construe them in the light most favorable to the plaintiff. *See id.* at 550; *Erickson v. Pardus*,

5  551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007).

6      If the court dismisses the complaint, it should grant leave to amend even if no request to

7  amend is made "unless it determines that the pleading could not possibly be cured by the

8  allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (internal quotation

9  marks omitted). But when a party repeatedly fails to cure deficiencies, the court may order

10  dismissal without leave to amend. *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992)

11  (affirming dismissal with prejudice where district court had instructed pro se plaintiff regarding

12  deficiencies in prior order dismissing claim with leave to amend).

13  **II. THE COURT DOES NOT CONSIDER THE DRAFT COMPLAINT**

14      At the outset, the court addresses the defendants' argument that the court can and should

15  consider allegations in a draft complaint that Mr. Miele III's counsel sent to Franklin Resources on

16  December 5, 2014 (about one month before he filed the Original Complaint and instituted this

17  action). (*See* Motion, ECF No. 19 at 13 n.2, 17-18.) The defendants claim that the court can

18  consider the allegations under the incorporation-by-reference doctrine.

19      "As a general rule, [a district court] 'may not consider any material beyond the pleadings in

20  ruling on a Rule 12(b)(6) motion.'" *United States v. Corinthian Colleges*, 655 F.3d 984, 998-99

21  (9th Cir. 2011) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)); *see*

22  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("[T]he general rule [is] that courts, when

23  ruling on a motion to dismiss, must disregard facts that are not alleged on the face of the complaint

24  or contained in documents attached to the complaint.") (citation omitted)). The incorporation-by-

25  reference doctrine is an exception to this rule. Under the doctrine, the court may (but it does not

26  have to[2]) consider documents outside of the pleadings, without converting the motion to dismiss

27  _____

28  [2]  The Ninth Circuit's "relevant case law has recognized consistently that the district court may,
but is not required to[,] incorporate documents by reference." *Davis v. HSBC Bank Nevada, N.A.*,

United States District Court
Northern District of California

1    into a motion for summary judgment, by considering documents "whose contents are alleged in a

2    complaint and whose authenticity no party questions, but which are not physically attached" to the

3    complaint. *Knievel*, 393 F.3d at 1076 (quotation omitted). The Ninth Circuit has "extended the

4    'incorporation by reference' doctrine to situations in which the plaintiff's claim depends on the

5    contents of a document, the defendant attaches the document to its motion to dismiss, and the

6    parties do not dispute the authenticity of the document, even if though the plaintiff does not

7    explicitly allege the contents of that document in the complaint." *Id.* (quotation omitted); *see*

8    *Corinthian Colleges*, 250 F.3d at 999 ("We may also consider unattached evidence on which the

9    complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is

10   central to the plaintiff's claim; and (3) no party questions the authenticity of the document.")

11   (citations omitted).

12       The incorporation-by-reference doctrine does not allow the court to consider the draft

13   complaint. The First Amended Complaint does not refer to the draft complaint or allege its

14   contents.[3] The issue thus is whether the First Amended Complaint depends or necessarily relies on

15   the draft complaint, even though it did not allege its contents. It does not. Courts apply the

16   doctrine when a plaintiff's claim relies on a dispositive document, such as the contract that is

17   relevant to a breach-of-contract claim. In *Parrino v. FHP, Inc.*, for example, the Ninth Circuit held

18   that the district court properly considered documents attached to a motion to dismiss that

19   described the terms of the plaintiff's group health insurance plan, where the plaintiff alleged

20   membership in the plan, his claims depended on the conditions described in the documents, and he

21   never disputed their authenticity. *See* 146 F.3d 699, 706 (9th Cir. 1998). The point of the doctrine

22   is that a plaintiff cannot state a claim that relies on a document that disproves it.

23       The defendants nonetheless argue that this is such a situation: the draft complaint has

24

25   _____

     691 F.3d 1152, 1159-60 (9th Cir. 2012) (citations omitted). As such, a district court's decision
26   whether to do so is reviewed by the Ninth Circuit for an abuse of discretion. *Id.*
     [3] The defendants suggest that by referring to the plaintiff's counsel's correspondence to the
27   defendants' counsel, the First Amended Complaint incorporates that correspondence and the draft
     complaint attached to it. (Opposition, ECF No. 19 at 17.) The court does not think that referring to
28   communications about lost shares to give context to a notice argument is the equivalent of
     referring to the draft complaint or its contents.

United States District Court
Northern District of California

allegations establishing that Mr. Miele III knew of his claims early enough that the statutes of limitations now bar them. (Opposition, ECF No. 19 at 17-18, 21.) Allegations (especially about the plaintiff's knowledge of his claim) in an draft version of a complaint that was never filed are not the same as a document (such as a contract or a health plan) that renders a claim legally deficient. It also is not relevant context that the court might consider. For example, a court can consider the newspaper or website context of an allegedly defamatory statement. *See Knievel*, 393 F.3d at 1076-77. That approach makes sense: a statement cannot be divorced from its undisputable context. Allegations in a draft complaint (drafted by an attorney) are not undisputable context. Discovery, of course, can illuminate the actual facts that the court can consider in a summary-judgment motion. But the draft complaint is not a document that the court can consider. Even if it were, the court in the exercise of its discretion would not consider it.

**III. CHOICE OF LAW**

The parties agree that the court must apply California law to Mr. Miele III's negligence, fraudulent-concealment, and negligent-prevention-of-assistance claims and that it must apply Delaware law to Mr. Miele III's claims under Delaware Code §§ 8-404 and 8-405, but they disagree about which state's law the court must apply to Mr. Miele III's breach-of-fiduciary-duty claims. The defendants argue that the "internal affairs doctrine" requires the court to apply Delaware law, and not California law, to them. (Motion, ECF No. 19 at 20 n.5; Reply, ECF No. 33 at 10, 17-18.)

A federal court sitting in diversity applies the choice-of-law rules of the forum state. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012). In this case, then, the court looks to California law.

"The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands." *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982) (citing Restatement (Second) of Conflict of Laws § 302, Comment b, pp 307-08 (1971)); *see Grosset v. Wenaas*, 42 Cal. 4th 1100, 1106 n.2 (Cal. 2008)

United States District Court
Northern District of California

1   (recognizing the Restatement's definition of the internal affairs doctrine); *State Farm Mutual*

2   *Automobile Ins. Co. v. Superior Court*, 114 Cal. App. 4th 434, 442-49 (Cal. Ct. App. 2003)

3   (discussing the doctrine in detail). For claims that are subject to the doctrine, "States normally

4   look to the State of a business'[s] incorporation for the law that provides the relevant corporate

5   governance general standard of care." *Atherton v. FDIC*, 519 U.S. 213, 224 (1997); *see Vaughn v.*

6   *LJ Int'l, Inc.*, 174 Cal. App. 4th 213, 223 (Cal. Ct. App. 2009) ("With certain exceptions, the law

7   of the state of incorporation applies.").

8       The California legislature has codified the internal affairs doctrine. Cal. Corp. Code § 2116;

9   *see Villari v. Mozilo*, 208 Cal. App. 4th 1470, 1478 n.8 (2012) ("Corporations Code section 2116

10  codifies [the internal affairs doctrine] in California.").[4] California Corporations Code § 2116

11  provides:

12          The directors of a foreign corporation transacting intrastate business are liable to the
            corporation, its shareholders, creditors, receiver, liquidator or trustee in bankruptcy
13          for the making of unauthorized dividends, purchase of shares or distribution of
            assets or false certificates, reports or public notices or other violation of official
14          duty according to any applicable laws of the state or place of incorporation or
            organization, whether committed or done in this state or elsewhere. Such liability
15          may be enforced in the courts of this state.

16      The defendants contend that Mr. Miele III's breach of fiduciary claims fall within this

17  doctrine, and the applicable authority shows that they are right. First, although there does not

18  appear to be any California authority directly holding that a claim for breach of fiduciary duty falls

19  within the internal affairs doctrine, the California Supreme Court has suggested that it does. *See*

20  *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 471 (Cal. 1992) (concluding that a

21  contractual choice-of-law clause required Hong Kong law to be applied to the plaintiff's breach-

22  of-fiduciary-duty claim, but stating that "even in the absence of a choice-of-law clause, Hong

23  Kong's overriding interest in the internal affairs of corporations domiciled there would in most

24  cases require application of its law") (citing *Matter of Reading Co.*, 711 F.2d 509, 517 (3d Cir.

25  1983); *McDermott Inc. v. Lewis*, 531 A.2d 206, 214-16 (Del. 1987); Restatement 2d Conf. of

26  Laws, § 302). Second, the Ninth Circuit and federal district courts sitting in California have held

27

28  ─────────────────
    [4] The court notes that neither party cited to California Corporations Code § 2116 in their briefs.

that a claim for breach of fiduciary duty falls within the doctrine. *See In re Spectrum Golf, Inc.*, 2007 WL 7540965, at *4 (9th Cir. Bankr. Aug. 16, 2007) (applying the law of the state of the defendant's incorporation to the plaintiff's breach of fiduciary duty claim); *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1527 (9th Cir. 1985) (stating that "[c]laims involving 'internal affairs' of corporations, such as the breach of fiduciary duties, are subject to the laws of the state of incorporation," and holding that "[i]ndemnification of corporate directors, like the fiduciary obligations of corporate directors, is an 'internal affair' of a corporation and is therefore subject to the law of the state of incorporation"); *McCreary v. Celera Corp.*, No. 11-1618 SC, 2011 WL 1399263, at *4 (N.D. Cal. Apr. 13, 2011) ("Plaintiff's fiduciary duty claims will be governed by Delaware law because Celera, Quest, and Spark Acquisition Corporation are all Delaware corporations."); *In re Verisign, Inc. Derivative Litig.*, 531 F. Supp. 2d 1173, 1215 (N.D. Cal. 2007) ("Delaware law, the law of the state of VeriSign's incorporation, applies to all causes of action that implicate the Company's internal affairs, including the claims for breach of fiduciary duty, accounting, unjust enrichment, rescission, constructive fraud, corporate waste, breach of contract, gross mismanagement, and restitution."); *Morton v. Rank America, Inc.*, 812 F. Supp. 1062, 1070 n.12 (C.D. Cal. 1993) ("Because Licensing Corporation is a New York Corporation, New York law governs the determination of matters relating to the corporation, including fiduciary duties."). These decisions come out this way because whether a corporation or its officers or directors has breached a fiduciary duty to the corporation's shareholders necessarily involves the relationship between them.

In response, Mr. Miele III cites language from a decision by the California Court of Appeals, Second District, *Lidow v. Superior Court*:

> There is, however, a vital limitation to the internal affairs doctrine: "The local law of the state of incorporation will be applied . . . *except where, with respect to the particular issue, some other state has a more significant relationship . . . to the parties and the transaction*[.]" (Rest. 2d Conf. of Laws, § 309, p. 332; italics added.) Indeed, "[t]here is no reason why corporate acts" involving "the making of contracts, the commission of torts and the transfer of property" "should not be governed by the local law of different states." (*Id.* at § 302, com. e, p. 309.)

206 Cal. App. 4th 351, 359 (Cal. Ct. App. 2012). Mr. Miele III then highlights that his claims in this action sound in tort, and he argues that California has "a more significant relationship to the

United States District Court
Northern District of California

claims than does Delaware." (Opposition, ECF No. 27 at 11.)

*Lidow* does not help Mr. Miele III here. The "novel issue" in that case was "whether, under a conflict of laws principle known as the internal affairs doctrine, California law or foreign law applies to a claim brought by an officer of a foreign corporation for wrongful termination in violation of public policy." *Lidow*, 206 Cal. App. 4th at 354. After surveying the previous California opinions applying or not applying the internal affairs doctrine to various kinds of claims, the court concluded that the allegations presented there—that the corporate officer was removed in retaliation for his complaints about possible illegal or harmful activity and breaches of ethical conduct—went beyond the type of claims based on a corporation's "internal governance" that had been held to fall within the doctrine and instead "touche[d] upon broader public interest concerns that California has a vital interest in protecting." *Id.* at 362; *see also id.* at 363-64 (noting that the California Supreme Court "has long recognized that claims for wrongful termination in violation of public policy serve vital interests insofar as they impose liability on employers who coerce their employees to engage in criminal or other harmful conduct, or employers who retaliate against their employees for speaking out against such conduct"). It is for this reason that the court set forth the narrow holding that "under the circumstances alleged here, specifically where a foreign corporation has removed or constructively discharged a corporate officer in retaliation for that person's complaints of possible harmful or unethical activity, California law applies." *Id.* at 354. Although the court earlier had quoted the Restatement's opinion that "[t]here is no reason why corporate acts" involving "the commission of torts and the transfer of property" "should not be governed by the local law of different states," the court's holding was not nearly so broad. Mr. Miele III's claims for breach of fiduciary duty do not implicate the "broader public interest concerns" that were implicated in *Lidow*.

The court concludes that Delaware law applies to Mr. Miele III's breach-of-fiduciary-duty claims against the defendants. This means that California law applies to Mr. Miele III's negligence, fraudulent-concealment, and negligent-prevention-of-assistance claims and that Delaware law applies to Mr. Miele III's breach-of-fiduciary-duty and Delaware Code §§ 8-404 and 8-405 claims.

16

# IV. STATUTES OF LIMITATIONS ARGUMENTS

The defendants argue that the applicable statutes of limitations bar all of Mr. Miele III's claims.

A district court sitting in diversity applies state statutes of limitations and state tolling rules. *Albano v. Shea Homes Ltd. Partnership*, 634 F.3d 524, 530 (9th Cir. 2011). The court applies the California statutes of limitations to Mr. Miele III's negligence, fraudulent-concealment, and negligent-prevention-of-assistance claims and applies the Delaware statutes of limitations to Mr. Miele III's breach of fiduciary duty and Delaware Code §§ 8-404 and 8-405 claims.

## A. The California Claims

### 1. The Claims Accrued in October 2012

A statute of limitations begins to run when a claim accrues. *Aryeh v. Canon Bus. Solutions, Inc.*, 5 Cal. 4th 1185, 1191 (Cal. 2013) "Traditionally at common law, a 'cause of action accrues "when [it] is complete with all of its elements"—those elements being wrongdoing, harm, and causation.'" *Id.* (citations omitted). "This is the 'last element' accrual rule: ordinarily, the statute of limitations runs from 'the occurrence of the last element essential to the cause of action.'" *Id.* (citations omitted).

An exception to the "general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (Cal. 2005) (citing *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (Cal. 1999); *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal. 3d 176, 187 (Cal. 1971)). In several opinions over the past forty years, the California Supreme Court has articulated a standard for the application of the discovery rule, at least in the tort context. *See generally Fox*, 35 Cal. 4th 797 (Cal. 2005); *Norgart*, 21 Cal. 4th 383; *Bernson v. Browning-Ferris Indus.*, 7 Cal. 4th 926 (Cal. 1994); *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103 (Cal. 1988); *Gutierrez v. Mofid*, 39 Cal. 3d 892 (Cal. 1985); *Sanchez v. South Hoover Hosp.*, 18 Cal. 3d 93 (Cal. 1976). As the California Supreme Court explained:

> A plaintiff has reason to discover a cause of action when he or she "has reason at least to suspect a factual basis for its elements." Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with

United States District Court
Northern District of California

17

> knowledge of any remaining elements, will generally trigger the statute of limitations period. *Norgart* explained that by discussing the discovery rule in terms of a plaintiff's suspicion of "elements" of a cause of action, it was referring to the "generic" elements of wrongdoing, causation, and harm. In so using the term "elements," we do not take a hypertechnical approach to the application of the discovery rule. Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them.

*Fox*, 35 Cal. 4th at 806 (internal citations omitted); s*ee Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1054 (9th Cir. 2008) ("Although [accrual] ordinarily occurs on the date of the plaintiff's injury, accrual is postponed until the plaintiff either discovers or has reason to discovery the existence of a claim, i.e., at least has reason to suspect a factual basis for its elements.") (citing *Slovensky v. Friedman*, 142 Cal. App. 4th 1518, 1528 (Cal. Ct. App. 2006)). "[T]o rely on the discovery rule for delayed accrual of a cause of action, '[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Fox*, 35 Cal. 4th at 808 (quoting *McKelvey v. Boeing N. Am., Inc.*, 74 Cal. App. 4th 151, 160 (Cal. Ct. App. 1999)).

The defendants first argue that Mr. Miele III's claims accrued in 1991 or 1992, when Mr. Miele III alleges that the shares of Franklin Resources were transferred out of the "Anthony P. Miele Jr. TTEE Anthony P. Miele III" account. (Motion, ECF No. 19 at 19.) They did not. Mr. Miele III does allege that the shares were transferred out of the account around that time, but he also alleges that he did not know that the shares existed until 2012. Under California's discovery rule, Mr. Miele III's claims did not accrue until he had reason to suspect that he was injured by wrongdoing, and he could not have had reason to suspect that he was injured by wrongdoing if he did not know the shares existed.

The defendants' main argument is that Mr. Miele III's claims accrued no later than October 2012. (Motion, ECF No. 19 at 19-20; Reply, ECF No. 33 at 8-10.) The court agrees. According to the First Amended Complaint, Mr. Miele learned that the Franklin Resources stock existed in August 2012. (FAC ¶¶ 101-02.) During that month, Mr. Miele III discussed the stock with Mr. Mulvihill, who said the stock related to the money Mr. Mulvihill gave to Mr. Miele III in 1990.

1    (*Id.* ¶ 101.) In October 2012, Mr. Miele III had another conversation with Mr. Mulvihill. During

2    that conversation, Mr. Miele III told Mr. Mulvihill that Mr. Mulvihill needed to explain what

3    happened with the shares of Franklin Resources. (*Id.* ¶ 104.) Mr. Mulvihill told Mr. Miele III that

4    mail regarding the shares of Franklin Resources kept being returned to Mr. Johnson, so Mr.

5    Johnson contacted him, and he told Mr. Johnson that he would take care of it. (*Id.*) Mr. Mulvihill

6    told Mr. Miele III that he (Mr. Mulvihill) then contacted one of his business partners, John

7    Steinbach, who "signed something" for Mr. Mulvihill. (*Id.*) Mr. Mulvihill said that J.P. Miele, Mr.

8    Miele Jr.'s brother and Mr. Miele III's uncle, cashed all of the dividends. (*Id.*) Mr. Mulvihill also

9    said to Mr. Miele III that if he [Mr. Miele III] ever investigated this matter, Mr. Brennan "would

10   hire a Russian hit man to kill you [Mr. Miele III] and your family." (*Id.*) These allegations—that

11   someone else had "signed something" with respect to the shares held in trust for Mr. Miele III, that

12   M. Miele III's uncle cashed all of the dividends issued in relation to those shares, and that

13   someone would try to kill Mr. Miele III and his family if he investigated the matter— gave Mr.

14   Miele III "reason to at least suspect that a type of wrongdoing has injured [him]." *Fox*, 35 Cal. 4th

15   at 806.

16        Mr. Miele III nonetheless contends that he did not suspect that he had been harmed by

17   wrongdoing until March or April 2014, when he learned of "key information" and "significant

18   facts" "underpinning his claims." (Opposition, ECF No. 27 at 8, 13-15.) On March 21, 2014, Mr.

19   Miele III received documents from Franklin Resources confirming (1) the existence of shares and

20   dividends that had been held by BoNY on March 4, 1991 and (2) the transfer of the shares and

21   dividends in September and October 1991. (FAC ¶ 114.) He also received the communications

22   between BoNY and Mr. Burns regarding these shares. (*Id.*) On April 16, 2014, Mr. Miele III

23   "came into the possession of files related to" the Miele Jr. Estate, and those files revealed that no

24   successor custodian had been appointed for the "Anthony P. Miele Jr. TTEE Anthony P. Miele

25   III" trust. (*Id.* ¶ 115.)

26        Mr. Miele III's obtaining of additional "key information" and "significant facts"

27   "underpinning his claims" does not affect when his claims accrued. California's discovery rule

28   postpones accrual of a claim until a plaintiff discovers, or has reason to discover, a factual basis

United States District Court
Northern District of California

19

for a claim's elements. *Fox*, 35 Cal. 4th at 806. That happens when the plaintiff has reason to at least suspect that a type of wrongdoing has injured him or her. *Id.* Once a plaintiff has reason to suspect that he or she has been harmed by wrongdoing, the claim accrues, even if a plaintiff does not have all of the facts necessary to support that claim. *See Platt Elec. Supply, Inc.*, 522 F.3d at 1054 ("'Plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation. So long as there is a reasonable ground for suspicion, the plaintiff must go out and find the facts; she cannot wait for the facts to find her.'") (quoting *Slovensky*, 142 Cal. App. 4th at 1529) (internal citation and quotation marks omitted). By October 2012, Mr. Miele III had reason to at least suspect that he had been harmed by wrongdoing.

If Mr. Miele III is arguing that his claims did not accrue because he did not know that he could sue Franklin Resources or Mr. Johnson until March or April 2014, this argument fails. As the Ninth Circuit has noted, "[t]he general rule in California is that 'ignorance of the identity of the defendant is not essential to a claim and therefore will not toll the statute [of limitations].'" *New Amsterdam Project Mgmt. Humanitarian Found. v. Laughrin*, 400 Fed. App'x 250, 252 (9th Cir. Oct. 7, 2010) (quoting *Bernson*, 7 Cal. 4th at 932); *see Fox*, 35 Cal. 4th at 807.

Mr. Miele III also contends that, under California's discovery rule, where a fiduciary duty is involved, a claim does not accrue until he has actual knowledge of wrongdoing (as opposed to reason to suspect it). (*See* Opposition, ECF No. 27 at 11-12.) The opinions he cites for this argument, however, do not support it. He cites *Bennett v. Hibernia Bank*, 47 Cal. 2d 540, 563 (Cal. 1956), and *Schneider v. Union Oil Co.*, 6 Cal. App. 3d 987, 994 (Cal. Ct. App. 1970), which in turn cite and rely upon *Hobart v. Hobart Estate Co.*, 26 Cal. 2d 412 (Cal. 1945), for the point that "in cases involving such a [fiduciary] relationship facts which would ordinarily require investigation may not excite suspicion, and that the same degree of diligence is not required." *Hobart*, 26 Cal. 2d at 440. This, however, does not mean that a claim does not accrue even if a plaintiff should be suspicious of wrongdoing, as Mr. Miele III contends. Indeed, *Hobart* prefaces its statement by stating that "the general rules relating to pleading and proof of facts excusing a late discovery of fraud remain applicable." *Id.*; *see Bedolla v. Logan & Frazier*, 52 Cal. App. 3d

118, 131 (Cal. Ct. App. 1975) (rejecting such a reading of *Hobart*); *see also Graham-Sult v. Clainos*, 756 F.3d 724, 743 (9th Cir. 2013) (Even if "the same degree of diligence is not required where a fiduciary relationship exists," "Plaintiffs have 'a duty to investigate even where a fiduciary relationship exists when [they have] notice of facts sufficient to arouse the suspicions of a reasonable man.'") (quoting *Elec. Equip. Express, Inc. v. Donald H. Seiler & Co.*, 122 Cal. App. 3d 834, 855 (Cal. Ct. App. 1981)).

In sum, Mr. Miele III's claims under California law for negligence, fraudulent concealment, and negligent prevention of assistance accrued no later than October 2012.

### 2.   *A Three-Year Statute of Limitations Applies to Mr. Miele III's Fraudulent-Concealment Claim, and It Is Not Barred*

Mr. Miele III's fraudulent-concealment claim is subject to a three-year statute of limitations. Cal. Code Civ. Proc. § 338(d) ("Within three years: . . . (d) An action for relief on the ground of fraud or mistake. The cause of action in that case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake."). Mr. Miele III filed the Original Complaint in January 2015, within three years of October 2012. Thus, the statute of limitations does not bar his fraudulent-concealment claim.

### 3.   *A Two-Year Statute of Limitations Applies to Mr. Miele III's Negligence and Negligent-Prevention-of-Assistance Claims, and They Are Barred*

"To determine the statute of limitations which applies to a cause of action it is necessary to identify the nature of the cause of action, i.e., the 'gravamen' of the cause of action." *Hensler v. City of Glendale*, 8 Cal. 4th 1, 22-23 (Cal. 1994). "[T]he nature of the right sued upon and not the form of action nor the relief demanded determines the applicability of the statute of limitations under our code." *Maguire v. Hibernia Sav. & Loan Soc.*, 23 Cal. 2d 719, 733 (Cal. 1944).

In California, several statutes of limitations may bear upon a negligence-based claim. *See Thomas, McGhee, Kahn & La Scala*, Cal. Civ. Prac. Torts § 1:47 (2015). The statute of limitations for "ordinary negligence" claims is two years. Cal. Code Civ. P. § 335.1; *see Pouzbaris v. Prime Healthcare Servs.-Anaheim, LLP*, 236 Cal. App. 4th 116, 121 (Cal. Ct. App. 2015) ("ordinary negligence" claims are "governed by the two-year limitations period under section 335.1"); *see*

United States District Court
Northern District of California

*also Garcia v. City of Santa Clara*, No. C 10-2424 SI (PR), 2012 WL 506320, at *4 (N.D. Cal. Feb. 15, 2012) ("The two-year limitations period in CCP § 335.1 also applies to all causes of action that are based upon personal injury and negligence."). The statute of limitations for general "professional negligence" claims also is two years. Cal. Code Civ. P. § 339(1); *see Thomson v. Canyon*, 198 Cal. App. 4th 594, 606 (Cal. Ct. App. 2011) ("A cause of action for professional negligence is generally governed by the two-year statute of limitations under" section 339(1)); *see also Schutte & Koerting, Inc. v. Swett & Crawford*, 298 Fed. App'x 613, 614 (9th Cir. 2008) ("[T]he district court properly held that the 'gravamen' of S & K's claims was for professional negligence subject to a two-year statute of limitations period under Cal. Code. Civ. Proc. § 339.") (citing *Hydro-Mill Co., Inc. v. Hayward, Tilton and Rolapp Ins. Assocs., Inc.*, 115 Cal. App. 4th 1145, 1159 (Cal. Ct. App. 2004)).

Neither party distinguishes between these two statutes, probably because the limitations periods set forth in both are two years. The court thinks that Mr. Miele III's claims in this action are of the "ordinary negligence" variety, and thus it applies section 335.1.

Mr. Miele III filed his Original Complaint in January 2015, more than two years after the claims accrued in October 2012. Mr. Miele III argues that the statute of limitations is tolled because the defendants "fraudulently concealed material facts from [him] and transferred his property without authorization." (Opposition, ECF No. 27 at 16.) The court disagrees.

Equitable tolling "is concerned with the point at which the limitations period begins to run and with the circumstances in which the running of the limitations period may be suspended." *Lantzy v. Centex Homes*, 31 Cal. 4th 370, 383 (Cal. 2003). It is a judge-made doctrine that suspends or extends a statute of limitations "as necessary to ensure fundamental practicality and fairness." *Id.* at 370. In *Lantzy*, the California Supreme Court explained that it has applied equitable tolling "in carefully considered situations to prevent the unjust technical forfeiture of causes of action, where the defendant would suffer no prejudice." *Id.* "[T]he effect of equitable tolling is that the limitations period *stops running* during the tolling event, and begins to run again only when the tolling event has concluded." *Id.* (emphasis in original). "As a consequence, the tolled interval, no matter when it took place, is tacked onto the end of the limitations period, thus extending the

1  deadline for suit by the entire length of time during which the tolling event previously occurred."

2  *Id.* at 370-71.

3      A statute of limitations may be equitably tolled by a defendant's fraudulent concealment of a

4  claim—that is, "where a defendant, through deceptive conduct, has caused a claim to grow stale."

5  *Aryeh*, 5 Cal. 4th at 1192 (citing *Regents of Univ. of Cal. v. Superior Court*, 20 Cal. 4th 509, 533

6  (Cal. 1999)). But "[a] defendant's fraudulent concealment tolls the statute of limitations only

7  when, as a result of that concealment, the plaintiff fails to discover some critical fact," *Goldrich v.*

8  *Natural Y Surgical Specialties, Inc.*, 25 Cal. App. 4th 772, 784 (Cal. Ct. App. 1994) (citation

9  omitted), and the tolling lasts only as long as the plaintiff's reliance on the misrepresentations is

10  reasonable, *Grisham v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 637 (Cal. 2007) (citation

11  omitted). The California Supreme Court has explained the doctrine thusly:

12      It has long been established that the defendant's fraud in concealing a cause of
        action against him tolls the applicable statute of limitations, but only for that period
13      during which the claim is undiscovered by plaintiff or until such time as plaintiff,
        by the exercise of reasonable diligence, should have discovered it. Notwithstanding
14      a defendant's continuing efforts to conceal, if plaintiff discovers the claim
        independently, the limitations period commences. This rule has been applied even
15      in those cases in which there was imposed on a defendant a fiduciary duty of
        disclosure. The rationale for the foregoing rule is that the culpable defendant should
16      be estopped from profiting by his own wrong to the extent that it hindered an
        "otherwise diligent" plaintiff in discovering his cause of action.
17

18  *Sanchez v. S. Hoover Hosp.*, 18 Cal.3d 93, 99-100 (Cal. 1976) (internal citations omitted); *see*

19  *Bernson*, 7 Cal. 4th at 931.

20      Mr. Miele III does not identify any instances where the defendants fraudulently concealed

21  anything from him such that the statute of limitations should be tolled. He says that the defendants

22  concealed from him the facts that the shares of Franklin Resources were transferred in 1991

23  without his authorization and under puzzling circumstances and that BoNY conducted an internal

24  investigation in 2008 regarding the shares. (Opposition, ECF No. 27 at 16.) But these events took

25  place before Mr. Miele III's claims accrued. In any case Mr. Miele III already should have

26  discovered the claim independently in October 2012. *See Snapp & Assocs. Ins. Servs., Inc. v.*

27  *Malcolm Bruce Burlingame Robertson*, 96 Cal. App. 4th, 884, 890-91 (Cal. Ct. App. 2002) ("The

28  fraudulent concealment doctrine does not come into play, whatever the lengths to which a

United States District Court
Northern District of California

defendant has gone to conceal his wrongs, if a plaintiff is on notice of a potential claim.") (internal quotation marks omitted), disapproved of on other grounds by *Aryeh*, 55 Cal. 4th at 1196-97.

Mr. Miele III also says that Mr. Johnson told Anson Beard Jr. in May 2013 that he was ready to be of any assistance to Mr. Miele III's counsel, but the defendants did not provide any documents to Mr. Miele III's counsel until March 21, 2014. (Opposition, ECF No. 27 at 16 (citing Beard Jr. Decl. ¶ 11, ECF No. 27-1 at 3.)) This statement, even if true, does not show deceptive conduct by the defendants.

The court concludes that the statute of limitations period is not subject to equitable tolling. The court also notes that Mr. Miele III has filed two complaints in this action (the Original Complaint and the First Amended Complaint) and that he knew that the tolling of the statute of limitations would be an issue because the defendants moved to dismiss his Original Complaint on statute of limitations grounds. Thus, as alleged in the First Amended Complaint, Mr. Miele III's negligence and negligent-prevention-of-assistance claims are time-barred, and the court does not believe that leave to amend to once again try to allege facts supporting tolling is warranted.

### B.  Mr. Miele III's Delaware Claims

#### 1.  *The Claims Accrued in October 2012*

"The general law in Delaware is that the statute of limitations begins to run, i.e., the cause of action accrues, at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action." *In re Dean Witter P'ship Litig.*, No. CIV. A. 14816, 1998 WL 442456, at *4 (July 17, 1998) (citations omitted); *see Coleman v. Pricewaterhousecoopers, LLC*, 854 A.2d 838, 842 (Del. 2004) ("Generally, a cause of action arising in tort 'accrues' at the time the tort is committed.") "Ignorance of the cause of action will not toll the statute, absent [(1)] concealment or fraud, or [(2)] unless the injury is inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of." *Coleman*, 854 A.2d at 842 (citing *Isaacson, Stolper & Co. v. Artisan's Sav. Bank*, 330 A.2d 130, 132-33 (Del. 1974)). "In the latter circumstance," which alternatively is referred to as the "discovery rule," the "time of discovery rule," and the "doctrine

United States District Court
Northern District of California

of inherently unknowable injuries,"[5] "the statute of limitations begins to run upon the discovery of facts 'constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery' of such facts." *Id.* (citing *Becker v. Hamada, Inc.*, 455 A.2d 353, 356 (Del. 1982)); *see Isaacson, Stolper & Co.*, 330 A.2d at 132-33 (recognizing the discovery rule as an exception to the general rule of accrual) (citing *Layton v. Allen*, 246 A.2d 794, 798 (Del. 1968)).

Delaware's discovery rule is substantially similar to California's discovery rule. The court reaches the same conclusion: the claims accrued in October 2012. The injury Mr. Miele III complains of was "inherently unknowable" until then because, as he alleges, he did not know that the shares existed and he was blamelessly ignorant of any wrongful act and the injury complained of. Conversely, to the extent that Mr. Miele III argues that his claims under Delaware law (he cites only California law in his opposition) accrued later than this, his argument is identical to the one the court rejected above: while information that Mr. Miele III received in March and April 2013 is important to his claims against the defendants, it does not negate the fact that he had reason to suspect in October 2012 that he had been harmed by wrongdoing.

### 2. *The Three-Year Statute of Limitations Does Not Bar the Breach-of-Fiduciary-Duty-Claims*

A three-year statute of limitations applies to the breach of fiduciary duty claims. 10 Del. C. § 8106; *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4 ("It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty.") (citations omitted); *see Perdana Capital (Labuan) Inc. v. Chowdry*, 868 F. Supp. 2d 851, 857 (N.D. Cal. 2012) (applying a three-year statute of limitations to breach-of-fiduciary-duty claims arising under Delaware law). Mr. Miele III filed his Original Complaint in January 2015, within three years of his claims accruing. Thus, the statute of limitations does not bar his breach-of-fiduciary-duty claims.

---

[5] *See Cavalier Grp. v. Strescon Indus., Inc.*, 782 F. Supp. 946, 951 (D. Del. 1992) (referring to the "time of discovery rule"); *Coleman*, 854 A.2d at 842 (referring to the "discovery rule"); *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *5 (referring to the "doctrine of inherently unknowable injuries").

United States District Court
Northern District of California

### 3.   *The Delaware Code §§ 8-404 and 8-405 Claims Are Not Barred by Delaware Code § 8-406*

To bring a claim under either Delaware Code §§ 8-404 and 8-405 (which are provisions of the Uniform Commercial Code), a plaintiff must "notify the issuer" of a security certificate that the security certificate has been lost, apparently destroyed, or wrongfully taken, "within a reasonable time" after the plaintiff learns of this fact. 6 Del. C. § 8-406. Delaware Code § 1-205 provides that "[w]hether a time for taking an action required by Uniform Commercial Code is reasonable depends on the nature, purpose and circumstances of the action." 6 Del. C. § 1-205; *see Weller v. Am. Tel. & Tel. Co.*, 290 A.2d 842, 845 (Del. Ch. 1972) (looking to former Delaware Code § 1-204, which is current Delaware Code § 1-205, to define what a "reasonable time" is under former Delaware Code § 8-405, which is current Delaware Code § 8-406)

In their motion, the defendants point out that Delaware courts have applied a three-year statute of limitations to similar claims for the conversion of securities, *see Mastellone v. Argo Oil Corp.*, 82 A.2d 379, 384 (Del. 1951), and they assert that the "reasonable time" mentioned in Delaware Code § 8-406 should be limited to three years. (Motion, ECF No. 19 at 25.) They also argue that the "reasonable time" limitation is similar to the equitable defense of laches, and they note that Delaware courts, when deciding whether a claim is barred by laches, often look to an analogous statute of limitations when determining whether a plaintiff unreasonably delayed in bring a claim. (Motion, ECF No. 19 at 24-25; Reply, ECF No. 33 at 16 (citing *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982).) They say that the three-year statute of limitations for conversion claims is an analogous statute of limitations.

The court concludes that Mr. Miele III's claims under Delaware §§ 8-404 and 8-405 are not time-barred. First, the defendants point out that Mr. Miele III's claims under these sections, as opposed to claims for conversion, likely arise in equity and not in law, *see Loretto Literary & Benevolent Inst.*, 444 A.2d 256, 259-60 (Del. Ch. 1982), as he seeks, through these claims, a new certificate for the shares (FAC ¶¶ 155, 160), and "the [statutes of] limitations of actions applicable in a court of law are not controlling in equity," *Adams*, 452 A.2d at 157. *See also Tuggle v. George Washington Corp.*, No. 432, 1975 WL 394053, at *1 (Del. Ch. May 22, 1975) (the court,

ORDER (No. 3:15-cv-00199-LB)

26

sitting in equity in an action to compel an issuer to issue a new certificate for shares transferred based on a forged signature, was "not bound by the Statute of Limitations at law"). This reading comports with Delaware Code § 1-205's statement that what a "reasonable time" is "depends on the nature, purpose and circumstances of the action." 6 Del. C. § 1-205; *see Tuggle*, 1975 WL 394053, at *2 ("This statute [former Delaware Code § 8-405, which is current Delaware Code § 8-406], in the circumstances of this case, may suggest a more liberal and flexible equitable standard rather than automatic reliance on the traditional case law relating to the Statute of Limitations."). But if the three-year statute of limitations applies, Mr. Miele III filed his complaint within three years after his claims accrued.

Second, if no statute of limitations applies, and the court instead must determine whether the doctrine of laches bars Mr. Miele III's claims, the court finds that they are not barred. As the Delaware Supreme Court has stated, "[k]nowledge and unreasonable delay are essential elements of the defense of laches," and "[w]hat constitutes unreasonable delay is a question of fact dependent largely upon the particular circumstances." *Adams*, 452 A.2d at 157. Here, an analogous statute of limitations is the three-year statute of limitations for conversion claims. Moreover, the court does not believe that Mr. Miele III unreasonably delayed in bringing his claims. He alleges that he did not know about the stock until August 2012, and he filed his suit within three years from then.

In sum, the claims are timely.

**V. BREACH-OF-FIDUCIARY-DUTY AND FRAUDULENT-CONCEALMENT CLAIMS**

The defendants also move to dismiss the California claims and the Delaware breach-of-fiduciary duty claims for failure to state a claim. (Motion, ECF No. 19 at 26-34.[6]) Given its holding that the statute of limitations bars the negligence and negligent-prevention-of-assistance claims, the court addresses only the Delaware claims of breach of fiduciary duty and the California claim of fraudulent concealment.

---

[6] The defendants do not move to dismiss the Delaware Code §§ 8-404 and 8-405 claims on any ground other than the ground that they are time-barred. (Motion, ECF No. 19 at 26.)

ORDER (No. 3:15-cv-00199-LB)

United States District Court
Northern District of California

**A. The Delaware Breach-of-Fiduciary-Duty Claims**

Mr. Miele III alleges claims of breach of fiduciary duty by Mr. Johnson (claim one) and Franklin Resources (claim two). (FAC, ECF No. 17 at 25-26.) The court dismisses both with prejudice.

The defendants argue that Franklin Resources, a corporation, owes no fiduciary duty to Mr. Miele III, an alleged former shareholder of that corporation. (Motion, ECF No. 19 at 28-29.) They are right. *See A.W. Fin. Servs., S.A. v. Empire Resources, Inc.*, 981 A.2d 1114, 1127 n.36 (Del. 2009) ("Under Delaware law, the issuing corporation does not owe fiduciary duties to its stockholders."); *Arnold v. Soc. for Sav. Bancorp.*, 678 A.2d 533, 539 (Del. 1996) ("Plaintiff has not cited a single case in which Delaware courts have held a corporation directly liable for breach of the fiduciary duty of disclosure. Fiduciary duties are owed by the directors and officers to the corporation and its stockholders."); *In re Wayport, Inc. Litig.*, 76 A.3d 296, 322-23 (Del. Ch. 2013) (entering judgment against the shareholder plaintiffs and in favor of the defendant corporation on the plaintiffs' breach of fiduciary duty claim because "[a]s a corporate entity, [the corporation] did not owe fiduciary duties to its stockholders"); *Alessi v. Beracha*, 849 A.2d 939, 950 (Del. Ch. 2004) (dismissing with prejudice the shareholder plaintiff's breach of fiduciary duty claim against the defendant corporation because the corporation owed no fiduciary duty to the plaintiff). Indeed, as a federal district court applying Delaware law has explained:

> Under Delaware law, "a breach of fiduciary duty claim must be based on an actual, existing fiduciary relationship between the plaintiff an[d] the defendants at the time of the alleged breach." Directors and officers of a corporation owe fiduciary duties of care and loyalty to the corporation, and in certain circumstances, to individual shareholders like [the plaintiff]. But a corporation enjoys a legal identity that is wholly separate from its directors and officers. In the same way that a person cannot be his or her own fiduciary, that separate corporate entity owes no fiduciary duties to itself or its shareholders. The logic underlying the principle that directors and officers, rather than corporations, may be found liable for breach of fiduciary duty lies in the nature of the action. Because the cause of action arises from a misuse of corporate control, "claims of fiduciary duty ultimately rest on the proposition that a corporate fiduciary has caused the corporation to do something at odds with its own best interests." The law places responsibility for such misuse of corporate power on the party that abused the fiduciary relationship—the directors and officers.

*Jayhawk Capital Mgmt., LLC v. LSB Indus., Inc.*, No. 08-2561-EFM, 2012 WL 4210462, at *9 (D. Kan. Sept. 19, 2012) (footnotes omitted).

Mr. Miele III does not address Delaware law or these Delaware authorities in his opposition brief. Instead, he cites California authorities for the point that a corporation owes fiduciary duties to its shareholders. Delaware law, not California law, applies, however. The court dismisses with prejudice the claim against Franklin Resources.

The defendants next argue that Mr. Miele III did not allege that Mr. Johnson, as Franklin Resources's then-CEO, breached any fiduciary duty to Mr. Miele III. (Motion, ECF No. 19 at 29-30.) First, the defendants argue that Mr. Johnson was "acting outside of his role as Franklin [Resources's] CEO" and "was not acting in a fiduciary capacity toward [Mr. Miele III] when he [Mr. Johnson]" "recognized the Miele family name," "called [Mr.] Mulvihill," and "attempted to alert [Mr. Miele Jr.] that his stock was at risk of escheatment." (*Id.* at 29.) But the defendants do not say what Mr. Johnson's role as CEO entailed, and thus their statement that Mr. Johnson was acting outside of that role is conclusory.

Second, they argue that Delaware law "does not impose a fiduciary duty on an officer or director of a corporation to monitor and safeguard each individual investor's account." (*Id.*[7]) This is not quite what Mr. Miele III alleges, though. Mr. Miele III alleges that Mr. Johnson "owed a fiduciary duty of due care, good faith and loyalty" to Mr. Miele III and to Franklin Resources and that Mr. Johnson "breached that duty when he delegated to [Mr.] Mulvihill, a man who was convicted of forgery and barred from the securities industry, and [who] was in no way affiliated with Franklin [Resources], the responsibility of ensuring that [Mr.] Miele III received millions in unclaimed shares and dividends." (FAC ¶¶ 121-22.) Although he styled it as a single duty, Mr.

---

[7] To the extent that the defendants argue that an officer or director of a corporation cannot have a fiduciary duty to an individual shareholder (as opposed to the corporation's shareholders generally), Mr. Miele III cited at the July 23, 2015 hearing two opinions of the Delaware Supreme Court that suggest otherwise, at least with respect to the fiduciary duty of loyalty. *See In re TriStar Pictures, Inc., Litig.*, 634 A.2d 319, 321 (Del. 1993) (the defendants' conduct, as alleged, would have been a breach of the fiduciary "duty of loyalty" to certain minority shareholders); *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 501, 503 & n.4 (Del. 1981) (discussing the remedy for the "breach of trust of a fiduciary" and noting that Delaware law recognizes such a fiduciary relationship between officers and directors of a corporation and individual shareholders of the corporation); *see also Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (noting that *Lynch* involved the fiduciary "duty of loyalty"). But even assuming that Mr. Johnson owed Mr. Miele III a fiduciary duty of loyalty, the court concludes below that Mr. Miele III has not and cannot allege, under the circumstances of this case, that Mr. Johnson breached it.

United States District Court
Northern District of California

29

Miele III alleges that Mr. Johnson breached three fiduciary duties—those of care, good faith, and loyalty.

Under Delaware law, each director and officer of a corporation owes the corporation and its shareholders fiduciary duties of care and loyalty. *See Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009) (explicitly holding that directors and officers of a corporation owe the same fiduciary duties—those of care and loyalty—to the corporation and its shareholders); *In re Wayport, Inc., Litig.*, 76 A.3d at 314 ("Directors of a Delaware corporation owe two fiduciary duties: care and loyalty."). While some authority discusses a third fiduciary duty—to act in good faith—that is included within the so-called "triad" of fiduciary duties, the Delaware Supreme Court has made clear that a corporate officer or director's duty to act in good faith actually is subsumed within the fiduciary duty of loyalty. *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

The issue is whether Mr. Miele III sufficiently alleged that Mr. Johnson breached his fiduciary duties of care or loyalty. The answer is no. Under Delaware law, an officer or director has a fiduciary duty of care to "use that amount of care which ordinarily careful and prudent men would use in similar circumstances" in managing the affairs of a corporation and to "consider all material information reasonably available in making business decisions." *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005) (internal quotation marks omitted); s*ee also In re Brocade Comm'n Sys., Inc. Deriv. Litig.*, 615 F. Supp. 2d 1018, 1046 (N.D. Cal. 2009) (applying this standard). "To plead a violation of the duty of care, a plaintiff need not allege that a defendant knowingly breached or even consciously disregarded his fiduciary duty to the company; gross negligence is sufficient." *In re Brocade*, 615 F. Supp. 2d at 1046 (citing *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1148 (Del. Ch. 1994)). "In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are without the bounds of reason." *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d at 750 (internal quotation marks omitted).

In addition, "[t]o show a breach of the duty of care, plaintiffs must overcome the presumption, known as the business judgment rule, that the defendant[s] . . . have acted on an informed basis

United States District Court
Northern District of California

and in the honest belief they acted in the best interest of the corporation." *CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*, No. 03 Civ. 7936(DAB), 2007 WL 2915181, at *3 (S.D.N.Y. Oct. 4, 2007) (internal quotation marks and citations omitted); *see In re Walt Disney Co. Deriv. Litig.*, 907 A.2d at 747 (discussing the contours of the business judgment rule). "To overcome the presumption of the business judgment rule, the burden is on the plaintiff to show [that] the defendant . . . failed to act (1) in good faith, (2) in the honest belief that the action taken was in the best interest of the company or (3) on an informed basis." *Krim v. ProNet, Inc.*, 744 A.2d 523, 527 (Del. Ch. 1999).

The defendants argue that Mr. Miele III's allegations do not support a claim for breach of fiduciary duty because Mr. Johnson's fiduciary duty of care relates only to business decisions, and Mr. Johnson's telephone call to Mr. Mulvihill had nothing to do with any business decision. (Motion, ECF No. 19 at 30.) The court agrees. Mr. Miele III attempts to implicate corporate governance issues by alleging that Mr. Johnson "delegated" to Mr. Mulvihill his "responsibility" to ensure that Mr. Miele III "received millions in unclaimed shares and dividends," but he cites no authority holding or even suggesting that Mr. Johnson had such a responsibility. (*See* FAC ¶ 122; Opposition, ECF No. 27 at 21.) In his opposition, Mr. Miele III says that Mr. Johnson did not use due care when he "made no effort whatsoever to get the Miele family contact information, which would have actually avoided any loss, and instead provided confidential information regarding unwatched shares and dividends" to Mr. Mulvihill. Again, Mr. Miele III cites no authority supporting this point. And, none of the conduct Mr. Miele III complains of related to the management of Franklin Resources's affairs. As the authorities cited above make clear, a claim for breach of the fiduciary duty of care must involve an officer or director's business decisions. Simply put, Mr. Johnson's phone call to Mr. Mulvihill did not involve a business decision that Mr. Johnson made on behalf of Franklin Resources.

Nor has Mr. Miele III sufficiently alleged that Mr. Johnson breached his fiduciary duty of loyalty. "Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests." *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939); *see In re Walt Disney Co. Deriv. Litig.*, 907 A.2d at 750-51 (citing the "seminal case of *Guth v. Loft,*

United States District Court
Northern District of California

*Inc.*" for its description of the fiduciary duty of loyalty). Instead, "the duty of loyalty [essentially] mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). "The classic example that implicates the duty of loyalty is when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders." *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d at 751 (citing *Cede & Co.*, 634 A.2d at 362).

In this action, Mr. Miele III does not allege that Mr. Johnson engaged in any "self-dealing" of the classic example that would implicate this aspect of the duty of loyalty. *See In re Brocade*, 615 F. Supp. 2d at 1047 ("To establish self-dealing, a plaintiff must plead that the defendants either (1) stood on both sides of a transaction and dictated its terms in a self-dealing way or (2) received a personal benefit that was not enjoyed by the shareholders generally.") (citing *Cede & Co.*, 634 A.2d at 1047). This does not end the inquiry, however, because the fiduciary duty of loyalty prohibits more than self-dealing. *See Stone*, 911 A.2d at 370 ("the fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest"). "It also encompasses cases where the fiduciary fails to act in good faith." *Id.* As the Delaware Supreme Court has explained:

> Cases have arisen where corporate directors have no conflicting self-interest in a decision, yet engage in misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision. To protect the interests of the corporation and its shareholders, fiduciary conduct of this kind, which does not involve disloyalty (as traditionally defined) but is qualitatively more culpable than gross negligence, should be proscribed. A vehicle is needed to address such violations doctrinally, and that doctrinal vehicle is the duty to act in good faith.

*In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66 (Del. 2006). It also has "identified the following examples of conduct that would establish a failure to act in good faith:

> A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.

*Stone*, 911 A.2d at 369 (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d at 67); s*ee In re*

*Brocade*, 615 F. Supp. 2d at 1047 ("Under Delaware law, the duty of good faith is breached where a fiduciary acts with a purpose other than that of advancing the best interests of the corporation, with the intent to violate the law, or where the fiduciary fails to act in the face of a known duty to act."). Mr. Miele III fails to allege that Mr. Johnson (1) intentionally acted with a purpose other than that of advancing the best interests of Franklin Resources, (2) acted with the intent to violate applicable positive law, or (3) failed to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. Indeed, the gist of his allegations against Mr. Johnson is that Mr. Johnson should have known better than to tell Mr. Mulvihill that the shares would escheat to the State of New Jersey. Nowhere does he allege or even suggest any kind of bad intent on Mr. Johnson's part. Mr. Miele III's allegations do not meet the required standard.

The court dismisses with prejudice Mr. Miele III's breach of fiduciary duty claims against Franklin Resources and Mr. Johnson.

### B. The California Fraudulent-Concealment Claim

This is not a claim where Mr. Miele III could cure the factual deficiencies. The elements of an action for fraud and deceit based on concealment are: (1) the defendant concealed or suppressed a material fact, (2) the defendant was under a duty to disclose the fact to the plaintiff, (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff was unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff sustained damage. *Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal. App. 4th 603, 612-13 (Cal. Ct. App. 1992); *see also Prakashpalan v. Engstrom, Lipscomb and Lack*, 223 Cal. App. 4th 1105, 1129 (Cal. Ct. App. 2014) (applying the same elements).

The defendants argue that Mr. Miele III does not allege that they concealed any facts that they had a duty to disclose. The court agrees that he does not. In his First Amended Complaint, Mr. Miele III alleges that, in 1991, Mr. Johnson and Mr. Burns "were aware that the shares and dividends were the property of [Mr.] Miele III, that the property of [Mr.] Miele III had been illegally transferred, that [Mr.] Johnson had delegated the responsibility for delivering these shares to [Mr.] Mulvihill." (FAC ¶ 137.) He also alleges that, in 2008, Mr. Johnson "was aware that an

investigation had been conducted into [Mr.] Miele III's shares and dividends." (*Id.*) "Despite this knowledge, . . . [Mr.] Johnson suppressed or concealed these facts from [Mr.] Miele III, with the intention that [Mr.] Miele III be misled as to his dividends and shares in Franklin [Resources]." (*Id.* ¶ 139.)

These allegations do not suffice. Aside from these conclusory statements, Mr. Miele III never alleges any factual support for his claim that Mr. Johnson or Franklin Resources knew that the shares had been transferred illegally (as opposed to legally). He also cites no authority showing that Mr. Johnson or Franklin Resources had a duty to disclose this information to him. In fact, Mr. Miele III fails to address any of the defendants' arguments regarding this claim anywhere in his opposition brief. (*See generally* Opposition, ECF No. 27.[8]) Such a failure can be taken only as a concession on the defendants' points.

The court dismisses with prejudice Mr. Miele III's fraudulent-concealment claim against Mr. Johnson and Franklin Resources.

## VI. MOTION TO STRIKE

The defendants also move to strike the declarations the plaintiffs filed in support of their opposition brief. (Motion to Strike, ECF No. 33-1.) Because the court did not consider the declarations when deciding the defendants' motion to dismiss, the court denies the defendants' motion to strike the declarations as moot.

---

[8] Mr. Miele III argues that the fraudulent-concealment *doctrine* tolls the statute of limitations, but he never addresses the defendants' arguments regarding his fraudulent-concealment *claim*. (*See* Opposition, ECF No. 27 at 16-18.)

ORDER (No. 3:15-cv-00199-LB)

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### CONCLUSION

The court dismisses with prejudice Mr. Miele III's claims for breach of fiduciary duty, negligence, fraudulent concealment, and negligent prevention of assistance. His claims under Delaware Code §§ 8-404 and 8-405 against Franklin Resources survive. Because the court dismisses all of Mr. Miele III's claims against Mr. Johnson with prejudice, he is no longer a defendant to this action.

**IT IS SO ORDERED.**

Dated: August 18, 2015

_____
LAUREL BEELER
United States Magistrate Judge