UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

ANTHONY P. MIELE, III,

        Plaintiff,

    v.

FRANKLIN RESOURCES, INC., et al.,

        Defendants.

Case No. 15-cv-00199-LB

**ORDER GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Re: ECF Nos. 127 & 128

## INTRODUCTION

The plaintiff Anthony P. Miele III sued Franklin Resources and Charles Johnson (Franklin's former President, Chief Executive Officer, and Board Chairman) for allegedly mishandling shares of Franklin common stock that his father bought for him in 1973.[1] He alleges that the shares — worth more than $136,000,000 in January 2015 after stock splits — were lost, destroyed, or wrongfully transferred.[2] The court previously dismissed Miele III's fraud, negligence, and fiduciary-duty claims, and so just two claims remain (both against Franklin only): (1) wrongful registration, and (2) replacement of lost, destroyed, or wrongfully taken security certificates.[3]

---

[1] *See* Amended Compl. – ECF No. 17. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.* ¶¶ 118, 148–60.

[3] *See* Order re Motion to Dismiss – ECF No. 45.

Miele III moves for partial summary judgment under Delaware Code section 8-405 and wants Franklin to reissue (or replace) his missing shares.[4] Franklin moves for summary judgment on the ground that both claims are barred by Miele III's unreasonable delay in bringing the case under Delaware Code section 8-406 and the doctrine of laches.[5]

There is no genuine dispute of material fact that, under section 8-406, Miele III had notice that his shares were wrongfully transferred (or otherwise missing) in 1992 but did not notify Franklin until more than twenty years later. The court accordingly grants Franklin's summary-judgment motion and denies Miele III's motion.

## STATEMENT

In 1973, Miele III's father, Anthony P. Miele Jr., bought 4,000 shares of Franklin common stock.[6] He registered the shares (held in certificated form) in the name of "Anthony P. Miele, Jr. TTEE Anthony P. Miele III."[7] The next year, in 1974, Miele Jr. died unexpectedly at the age of thirty nine.[8] He died intestate and was survived by his wife, Evelyn, and three children: Miele III (at the time, three years old); Veronica (two years old); and Matthew (nine months old).[9] Evelyn, along with Julius Poppinga (a partner at McCarter & English) and J.P. Miele (an attorney and Evelyn's brother-in-law), administered the estate.[10]

For some years, the Mieles held the shares and received the dividends thereon. For example, as of December 1974, Miele Jr. Estate's safe deposit box contained the 4,000-share certificate.[11] And

---

[4] Miele III's Motion for Summary Judgment – ECF No. 127.

[5] Franklin's Motion for Summary Judgment – ECF No. 128.

[6] Molumphy Decl. – ECF No. 146, Exs. 16–18; Liddle Decl. – ECF No. 127-1, Exs. 11–13.

[7] Molumphy Decl., Exs. 17, 18; Liddle Decl., Exs. 12, 13.

[8] Molumphy Decl., Ex. 21; 12/1/2016 Miele III Decl. – ECF No. 127-3, ¶ 11.

[9] Molumphy Decl., Ex. 21; 12/1/2016 Miele III Decl. ¶ 11; 6/11/2015 Evelyn Miele Decl. – ECF No. 26-3, ¶ 5; Miele III Dep. – ECF No. 127-2 at 14 (pp. 34–35). Where this order cites depositions, the first pinpoint citation is to the ECF-generated page number; the additional, parenthetical "p." citation is to the deposition transcript's original pagination.

[10] 6/11/2015 Evelyn Miele Decl. ¶ 2.

[11] Molumphy Decl., Ex. 22 at 364.

the shares were reported on the estate's 1975 state and federal tax returns.[12] Similarly, Miele III —

with Evelyn acting as guardian[13] — reported $3,984 of Franklin dividends on his 1981, 1982, and

1984 tax returns.[14] Evelyn also received a $500 dividend check in 1983, but this amount did not

appear on Miele III's tax return.[15] And in 1983, McCarter & English sent Evelyn a letter with two

stock certificates enclosed: one for 4,000 shares and one for 1,000 shares.[16] Evelyn acknowledged

receipt of the letter and the certificates.[17] At this time, the Bank of New York ("BoNY") —

Franklin's transfer agent — showed the address of record as 160 S. Livingston Street, Livingston,

N.J., which was the address for J.P. Miele's law firm.[18]

 In 1983 or 1984, J.P. Miele moved, but BoNY's and Franklin's records do not reflect any

updated address of record.[19] As a result, mail to that address — including proxy cards, dividend

checks, and other materials — were returned as undeliverable.[20] By March 4, 1991, BoNY's

records show a total stock position of 140,625 shares: 12,500 shares released to the shareholder

(which represents the original 4,000 shares plus shares issued after stock splits through 1984) and

128,125 shares in the BoNY vault.[21] Returned dividend checks from January 13, 1984 to January

15, 1991 totaled $186,496.88.[22]

---

[12] *Id.*, Ex. 25 at 382, Ex. 26 at 404.

[13] *See id.*, Ex. 21.

[14] *Id.*, Exs. 35, 36, 40, 42, 46.

[15] *See id.*, Exs. 43, 45.

[16] Evelyn Miele Dep. – ECF No. 127-2 at 158 (pp. 110–11); 6/11/2015 Evelyn Miele Decl. ¶ 4.

[17] Evelyn Miele Dep. at 158, 159 (pp. 110–11, 114–15).

[18] Molumphy Decl., Ex. 19 (also filed at ECF No. 126-2 at 67–93).

[19] *See id.*; Miele III Dep. at 45–46 (pp. 159–60); Evelyn Miele Dep. at 159 (pp. 114–16).

[20] *See* Molumphy Decl., Exs. 47–49; Hanrahan Dep. – ECF No. 148-2 at 26 (pp. 90–91).

[21] Molumphy Decl., Ex. 49.

[22] *Id.*

### 1. The Status of the Franklin Shares in 1991–92

The critical years in this story — and, more precisely, the years critical to Franklin's affirmative defenses — are 1991 and 1992: two years during which family friend Gene Mulvihill paid the Mieles approximately $3 million and sold an equivalent number of Franklin shares, and during which Miele III received an IRS notice regarding $41,250 in Franklin dividends that he did not receive.

### 1.1 Mr. Mulvihill Pays the Miele Family At Least $3 Million

In 1991, "out of the blue," Gene Mulvihill — Miele Jr.'s former friend and business partner — called the Mieles.[23] Mr. Mulvihill first spoke to Evelyn and said "I think I can get you some money."[24] But Evelyn said she was not interested and hung up.[25] Mr. Mulvihill called back, however, and this time spoke to Miele III.[26] The conversation lasted only three to four minutes, and Mr. Mulvihill said that he was a friend of his father's, his father "did some deals in the past," and he could "get [Miele III] some money."[27]

So Miele III and his sister, Veronica, met Mr. Mulvihill for lunch.[28] The three ate, caught up, and discussed the money that Mr. Mulvihill mentioned on the phone.[29] He told them that the amount was around $2 million — a sum that Miele III considered "a lot" and that "could change [his] life."[30] Mr. Mulvihill did not say where the money came from, but explained that Miele Jr.

---

[23] Miele III Dep. – ECF No. 127-2 at 61 (pp. 221–24); Evelyn Miele Dep. at 160 (pp 119–20).

[24] Evelyn Miele Dep. at 160 (pp 119–20).

[25] *Id.*; Miele III Dep. at 61 (pp. 221–24).

[26] Miele III Dep. at 61 (pp. 221–24).

[27] *Id.*

[28] *Id.* at 62 (pp. 225–28).

[29] *Id.*

[30] *Id.*

"did a lot of deals with a lot of guys" and that he died young.[31] The lunch ended and Mr. Mulvihill said he would be in touch.[32]

Two or three weeks later, Mr. Mulvihill, along with accountant Albert Passanante, went to Evelyn's house.[33] Messrs. Mulvihill and Passanante, Miele III, and Evelyn met in the kitchen.[34] Mr. Mulvihill brought four trust agreements in the Mieles' names: (1) The Anthony P. Miele, III Trust; (2) The Evelyn Miele Trust; (3) The Veronica Miele Trust; and (4) The Matthew Miele Trust.[35] Evelyn signed as trustee the children's trust agreements and Veronica signed Evelyn's trust.[36] Mr. Mulvihill signed all four as nominee and settlor.[37] The trusts were intended invest the $2 million in Fidelity and Vanguard accounts.[38]

And for that purpose, Mr. Mulvihill presented a $2 million dollar check, made out to Miele III.[39] Miele III did not deposit the check (though he testified that his mother may have), and he decided to "whack[] up the money four ways," *i.e.* divide it equally among the family.[40] Again, Miele III "had no idea" where the money came from: Mr. Mulvihill told him only that the money came from his father's past "deals."[41] Mr. Mulvihill assured Evelyn Miele that the money was "legitimate"; the group did not discuss Miele Jr.'s Franklin shares.[42]

Mr. Passanante, the accountant, testified to that effect: he does not recall — or does not believe — that Mr. Mulvihill discussed the Franklin shares with Miele III.[43] Mr. Mulvihill did,

---

[31] *Id.*

[32] *Id.*

[33] *Id.* at 63 (pp. 229–32).

[34] *Id.*

[35] *Id.* at 63–64 (pp. 229–36); Molumphy Decl., Exs. 53–56.

[36] Miele III Dep. at 64 (pp. 233–34); Molumphy Decl., Exs. 53–56.

[37] Molumphy Decl., Exs. 53–56; Passanante Dep. – ECF No. 160-2 at 282 (pp. 45–46).

[38] Miele III Dep. at 63 (pp. 230–32).

[39] *Id.*

[40] *Id.* at 64, 66 (pp. 235–36, 242–43).

[41] *Id.* at 65 (pp. 238–39).

[42] *Id.*; Evelyn Miele Dep. at 160, 163, 168 (pp. 119–20, 130, 149).

[43] Passanante Dep. at 300 (p. 117).

1   however, tell Mr. Passanante about the shares: he said that "[he] was going to put shares of

2   Franklin Resources into the trusts."[44] He told Mr. Passanante "either before the meeting, after the

3   meeting, [or] during the meeting. More likely, [Mr. Passanante thought], on the way to the

4   meeting."[45] Mr. Mulvihill did not mention to Mr. Passanante "the actual numbers" or "value

5   involved" — *i.e.* the $2 million.[46]

6       In the end, Mr. Mulvihill gave the Mieles between $2 million and $4.3 million — the parties

7   dispute the total amount.[47] Franklin asserts that Mr. Mulvihill gave Miele III and his family "over

8   $4.3 million in cash and benefits."[48] The records show $500,000 deposited into Fidelity

9   Investment accounts for each of The Anthony P. Miele III Trust, The Veronica Miele Trust, and

10  The Matthew Miele Trust.[49] The records also show $540,000 deposited into The Evelyn Miele

11  Trusts' Fidelity account.[50] There are additionally two $40,000 checks, endorsed by Mr. Mulvihill

12  and addressed to the Vanguard Group, and corresponding Vanguard accounts for Veronica and

13  Matthew's trusts.[51] Mr. Mulvihill also paid $1,015,382 in taxes for the trusts.[52] Franklin also points

14  to records, and its forensic expert's findings, evidencing an additional $381,583 in investments

15  and $867,500 held for the Mieles' benefit.[53]

16      But Miele III objects to that evidence — at least the forensic expert's findings — and asserts

17  that "the most the family received from Mulvihill was $2 million plus tax payments of

18

19  _____

20  [44] *Id.* at 298 (p. 109–11).

    [45] *Id.*
21
    [46] *Id.*
22
    [47] *See* Franklin's Motion for Summary Judgment – ECF No. 128 at 18–19; Miele III's Opposition – ECF No. 160 at 18–19.
23
    [48] Franklin's Motion for Summary Judgment at 18.
24
    [49] Molumphy Decl., Exs. 57, 59, 60.
25
    [50] *Id.*, Ex. 58.
26  [51] *Id.*, Exs. 83–84. There is also a $50,000 check, signed by Evelyn as trustee, to the Vanguard Group and a corresponding Vanguard account for The Anthony P. Miele, III Trust. (*Id.*, Ex. 75.).

27  [52] *Id.*, Exs. 65–69.

28  [53] Franklin's Motion for Summary Judgment at 19; Molumphy Decl., Exs. 74, 82; Marois Decl. – ECF No. 172, Ex. 1 ¶¶ 56–61.

$1,015,382."[54] Indeed, Miele III testified that "there was [$]2 million and that was it"; Mr. Mulvihill did not give them any more money.[55] Evelyn also testified that Mr. Mulvihill — in one of their initial conversations — guaranteed the Mieles only $2 million.[56] And Veronica said that she did not know of Mr. Mulvihill giving the family any more than $2 million.[57] In other words, according to Miele III, the most that the family received from Mr. Mulvihill was approximately $3 million — $2 million plus $1,015,382 in taxes.[58]

There is evidence that Mr. Mulvihill sold Franklin shares worth approximately the same amount ($3 million). Franklin's expert states that "two almost illegible account statements for an F.N. Wolf & Co. account held in the name of 'Gene Mulvihill as Nominee'" reflect the sale of 92,875 Franklin shares for approximately $3,382,299 between September and October 1991.[59] In an April 30, 1992 letter, Ellen Lewis (Mr. Mulvihill's bookkeeper), wrote a letter to Richard Hanrahan (of BoNY) "RE: Anthony P. Miele, III."[60] Ms. Lewis requested that Mr. Hanrahan "contact [her] immediately when the dividend check is ready to be picked up."[61] Ms. Lewis also asked that "[w]hen transferring the 6,250 shares of Franklin Resources, please put them in the name of Gene Mulvihill, Nominee and forward them to" Michael Simineri at F.N. Wolf.[62]

### 1.2 Someone Submits Two Applications for Lost Instruments and BoNY Issues a Replacement 5,000-Share Certificate

There are two Seaboard Surety Company lost-instrument applications from 1991, both with Miele III's alleged signature and both applying for the replacement of his Franklin certificates.

---

[54] Miele III's Opposition at 18–19.

[55] Miele III Dep. at 66 (p. 244).

[56] Evelyn Miele Dep. at 160 (pp. 119–20).

[57] Veronica Miele Dep. – ECF No. 127-2 at 252 (pp. 78–80).

[58] Miele III's Opposition at 19.

[59] Marois Decl., Ex. 1 ¶ 53; *see also* Molumphy Decl., Ex. 52. The F.N. Wolf account records are indeed barely legible. But Miele III does not object to the records on this basis. He instead contests Franklin's assertion that the shares sold were his.

[60] Molumphy Decl., Ex. 76.

[61] *Id.*

[62] *Id.*

The first application, dated July 1991, lists four Franklin stock certificates, including the original certificate for 4,000 shares, and certificates for 1,000, 2,500, and 5,000 shares, respectively.[63] The latter three certificates represent shares issued after stock splits.[64] The application has what is allegedly Miele III's signature (though he denies signing it),[65] and the signature of Debra Tierney (formerly Debra Evers), a notary and Mr. Mulvihill's former bookkeeper.[66] Ms. Tierney testified that she did not see Miele III sign the application.[67]

The second application, dated December 1991, lists a single certificate for 5,000 shares (the same 5,000-share certificate listed in July).[68] The December application contains Miele III's purported signature (again, he denies signing the application),[69] and was notarized by Ellen Lewis.[70] Ms. Lewis was a notary who worked for Mr. Mulvihill as a bookkeeper from 1991–92.[71] She testified that the "person" who signed the application was present when she notarized it, but that she did not know who it was.[72]

In January 1992, BoNY issued a replacement 5,000-share certificate registered to "Anthony P. Miele Jr. TTEE Anthony P. Miele, III."[73] (Miele III does not move for summary-judgment on these shares.[74])

---

[63] Molumphy Decl., Ex. 51.

[64] *See* Marois Decl., Ex. 1 ¶¶ 46–47.

[65] 1/19/2017 Miele III Decl. – ECF No. 160-3, ¶ 3.

[66] Molumphy Decl., Ex. 51; Tierney Dep. – ECF No. 160-2 at 362–63, 375–77 (pp. 55–60, 106–13).

[67] Tierney Dep. at 375–77 (pp. 106–13).

[68] Molumphy Decl., Ex. 64.

[69] 1/19/2017 Miele III Decl. ¶ 3.

[70] Molumphy Decl., Ex. 64.

[71] Lewis Dep. – ECF No. 129-2 at 23, 26 (pp. 38–40, 95).

[72] Lewis Dep. at 27 (p. 98).

[73] Molumphy Decl., Ex. 71.

[74] *See* Miele III's Opposition at 16 n.6.

### 1.3 Franklin's Records About Miele III's Shares

Around the same time as the Mulvihill transactions and the lost-instrument applications, Miele III's Franklin position was reduced and eventually eliminated from Franklin's records.

Between 1974 and 1991, the Franklin shares remained registered to "Anthony P. Miele Jr. TTEE Anthony P Miele III."[75] A letter dated March 4, 1991, from BoNY set forth the number of outstanding shares and dividend checks in the account.[76] "Dividend checks from January 13, 1984 through January 15, 1991 total[ed] $186,496.88."[77] "Stock Certificates in [BoNY's] vaults represent[ed] 128,125 shares."[78] BoNY's records reflected a total position of 140,625 shares, but that the shareholder — "Anthony P. Miele Jr. TTEE Anthony P. Miele III" — held 12,500 shares.[79]

For the year 1991, an IRS Form 1099 shows dividend income of $50,096.89 paid on the shares registered to "Anthony P. Miele Jr TTEE Anthony P. Miele III."[80] That is equivalent to dividends paid on 128,125 shares for the quarters ending on December 30, 1990, March 28, 1991, and July 1, 1991, and dividends paid on 13,750 shares for the quarter ending September 30, 1991.[81] And, as of December 20, 1991, Franklin's Record Stockholder List reflected only 13,750 shares registered to "Anthony P Miele Jr TTEE Anthony P Miele III."[82] And in Franklin's December 22, 1992 Record Stockholder List, "Anthony P Miele Jr TTEE Anthony P Miele III" does not appear as a shareholder.[83] Indeed, that name does not appear "in any Record Stockholder Lists issued after

---

[75] Molumphy Decl., Ex. 19 (also filed at ECF No. 126-2 at 67–93).

[76] Molumphy Decl., Ex. 49; Hanrahan Dep. at 31 (pp. 111–12).

[77] Molumphy Decl., Ex. 49.

[78] *Id.*

[79] Molumphy Decl. Ex. 49. The parties value differently Miele III's total March 1991 holdings (140,625 shares). Franklin, by way of its expert, asserts that the total value of those shares, as of March 4, 1991, was $4,860,000. Miele III, on the other hand, identifies the minimum ($4,939,452.98), maximum ($7,945,312.36), and average ($5,995,605.44) value of those shares between September and December of 1991. (Marois Decl., Ex. 1 ¶ 49 & Ex. C; Liddle Decl. – ECF No. 160-1, ¶ 17 & Ex. 36.).

[80] Molumphy Decl., Ex. 70.

[81] *See* Marois Decl. ¶¶ 20–21.

[82] Gray Decl. – ECF No. 131, ¶ 7, Ex. 121 (also filed at ECF No. 126-11 at 32–35).

[83] *Id.* ¶ 8.

December 22, 1992 in [Franklin's] files."[84] And neither does "Anthony P. Miele III."[85] According to Maria Gray, Franklin's Corporate Secretary and Vice President, the shares held by "Anthony P Miele Jr TTEE Anthony P Miele III" were "transferred between December 20, 1991 and December 22, 1992."[86] But, after investigation, Ms. Gray did not find evidence that the shares "were ever registered into the name of another person."[87] BoNY — the transfer agent — has no information about the transfer of the names; it keeps records for only 7 years.[88]

## 2. The 1992 IRS Notice

### 2.1 Miele III Receives a Notice from the IRS in 1992

Following the above events, Miele III received from the IRS a "Notice of Proposed Changes to Your 1989 Tax Return," dated May 6, 1992.[89] The Notice is a five-page document that shows tax due attributable to taxes on taxable dividends, including dividends attributable to Franklin Resources stock.[90] On the first page, in the first three sentences, the IRS proposed to increase his 1989 tax by $19,066 in taxes, interest, and penalties.[91] The first three lines read:

> We are proposing changes to your 1989 tax return because the information on your tax return is not the same as the information reported to us by your employers, banks, and other payers.

> Based on your reply to our previous notice, we propose to increase your tax. As a result of this change, you will owe us $19,066.[92]

The next line advised Miele III to "compare your records with the pay information shown on page 3 of this notice."[93]

---

[84] *Id.*

[85] *Id.*

[86] *Id.*; *see also* Gray Dep. – ECF No. 136-3 at 58 (p. 97).

[87] Gray Dep. at 66 (pp. 128–29).

[88] *See* Flynn Decl. – ECF No. 163, ¶ 10.

[89] Molumphy Decl., Ex. 77.

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *Id.*

The next two paragraphs instructed Miele III what to do if he "agree[d] with the proposed changes on page 2" and what to do "if [he] d[id] not agree with the proposed changes."[94] The Notice instructed him that, if he agreed with the changes, he should "[c]heck box A on the last page," "[s]ign and date the consent to the tax increase," "[e]nclose [his] payment in full, if possible," and return the Notice's last page along with payment.[95] The Notice alternatively instructed that, if he disagreed with the changes, he should "[c]heck box B or C on the last page," [e]nclose a signed statement explaining why [he] disagree[d]," "[i]nclude any supporting documents" that he wanted the IRS to consider, and return the Notice's last page, his signed statement and documents, and a telephone number to reach him.[96] The rest of page 1 contains additional instructions and notices.[97]

The top of page 2 reads: "Our Proposed Changes to Your 1989 Income Tax (Detailed Information for These Changes Begins on Page 3)."[98] Immediately following is the table below, which shows a $41,325 increase in taxable dividends and a corresponding $12,823 increase in total taxes, plus interest and penalties:

| CHANGED ITEM(S) | SHOWN ON RETURN | REPORTED TO IRS BY PAYERS | INCREASE OR DECREASE |
|---|---|---|---|
| TAXABLE DIVIDENDS | $ 5,557 | $ 46,882 | $ 41,325.00 |

| PROPOSED CHANGES IN ADJUSTED GROSS INCOME | | | |
|---|---|---|---|
| TOTAL INCREASE | | | $ 41,325.00 |

| PROPOSED CHANGES IN TAX COMPUTATION | SHOWN ON RETURN | PROPOSED AMOUNT | INCREASE OR DECREASE |
|---|---|---|---|
| 1. TAXABLE INCOME | $ 28,540.00 | $ 69,865.00 | $ 41,325.00 |
| 2. TAX | 5,576.00 | 18,399.00 | 12,823.00 |
| 3. TOTAL TAXES | 5,576.00 | 18,399.00 | 12,823.00 |
| 4. NET TAX INCREASE.................................................... | | | 12,823.00 |
| 5. ACCURACY-RELATED PENALTY............................................ | | | 2,565.00 |
| 6. INTEREST FROM 4/15/90 TO 15 DAYS AFTER THE DATE OF THIS NOTICE....... | | | 3,678.00 |
| 7. PROPOSED AMOUNT YOU OWE IRS.......................................$ | | | 19,066.00 |

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] *Id.*

United States District Court
Northern District of California

The rest of page 2 is blank.[99]

Page 3 reflects "[a]mounts reported to IRS but not identified, fully reported, or correctly deduced on [Miele III's] income tax return for 1989."[100] Two items are listed, including $41,250 in Franklin dividends:

```
AMOUNTS REPORTED TO IRS BUT NOT IDENTIFIED, FULLY REPORTED, OR CORRECTLY DEDUCTED ON
YOUR INCOME TAX RETURN FOR 1989.

  1. FRANKLIN RESOURCES INC          ISSUED FORM 1099-DIV   TO    REDACTED
     THE BANK OF NEW YORK            FOR DIVIDENDS              $    41,250
                                        ORDINARY DIVIDEND           41,250
     ACCOUNT NUMBER   112510010000000687
     EIN 13-2670991                                                  0004

  2. GENERAL MOTORS CORPORATIO       ISSUED FORM 1099-DIV   TO    REDACTED
     FIRST CHICAGO TRUST COMPA       FOR DIVIDENDS              $       75
                                        ORDINARY DIVIDEND              75
     ACCOUNT NUMBER FCTNY010901298574376
     EIN 38-0572515                                                  0005
```

The remainder of page 3 explains the changes and provides further instructions, which continue onto page 4.[101]

The final page (page 5) — titled "Response to Our Proposed Changes to Your 1989 Income Tax" — contains three check-boxes: (A) "total agreement, consent to tax increase," (B) "partial agreement with proposed changes," and (C) "total disagreement with proposed changes."[102] There is room for the taxpayer's (Miele III's) signature.[103]

### 2.2 Miele III Reads the First Three Lines of the Notice, "Freaks Out," Calls His Accountant, and Pays the Tax

The IRS sent the Notice to Evelyn's house in Whitehouse Station, NJ.[104] His mother called and told him that he received a piece of mail that "look[ed] like it's from the IRS."[105] Miele III,

---

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] *Id.*; Miele III Dep. at 32 (pp. 107–08).

[105] *Id.*

United States District Court
Northern District of California

twenty-one years old at the time,[106] drove to his mother's house, "pulled the letter out," and "read the first two sentences, that [the IRS] [was] going to do some kind of a change to one of [his] tax returns."[107] He then read the third sentence, which "said that [he] owed money."[108] He stopped there — he did not read beyond the third sentence.[109] Miele III testified that he was scared and "kind of freaked out."[110]

He was scared because he "didn't want to draw any attention to [him]self, considering what he was doing in school."[111] He was "running numbers," or operating a sports-gambling business, involving "[t]ens of thousands of dollars" and making profits of $30,000 to $50,000 in 1989–91, and almost $100,000 in 1994 or 1995.[112] He was not reporting these profits to the IRS because "[i]t was all cash."[113]

So Miele III asked his mother what to do.[114] She told him to call Mr. Mulvihill because she was "sure he kn[ew] somebody that [Miele III] could talk to."[115] So he did, and Mr. Mulvihill told him: "your new accountant is going to be Elliot Goldberg. Just send it over to him and he'll take care of it."[116] Miele III said "okay."[117]

Mr. Goldberg, a certified public accountant since 1965 who worked with Mr. Mulvihill, twice spoke to Miele III about the IRS Notice.[118] In the first conversation, Miele III told Mr. Goldberg

---

[106] *See* Amended Compl. ¶ 5.

[107] Miele III Dep. at 32 (pp. 107–08).

[108] *Id.*

[109] *Id.* at 73–74 (pp. 272–73).

[110] *Id.* at 32, 71 (pp. 107–08, 264).

[111] *Id.* at 71–72 (pp. 264–65).

[112] *Id.* at 33–34, 71–72 (pp. 110–13, 264–65).

[113] *Id.* at 34 (p. 113).

[114] *Id.* at 32 (pp. 107–08).

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] 8/10/2016 Goldberg Dep. – ECF No. 146-1 at 148, 152, 160–62 (pp. 15–16, 29–30, 64–70).

about the Notice and he asked Miele III to send it to him.[119] After Mr. Goldberg received the

Notice, they talked again.[120]

Mr. Goldberg initially testified that, during this second conversation, he told Miele III about

the dividends on the IRS Notice and asked Miele III if he received the money.[121] According to Mr.

Goldberg, Miele III responded "I don't know," to which Mr. Goldberg said, "well, then you better

call — get copies of the 1099s and take care of it."[122] He explained that Miele III should contact

"[w]hoever sent the 1099" and "if you didn't get the money, then find out . . . where the 1099 is

and where the money is."[123] Mr. Goldberg testified that he "absolutely" advised Miele III to

follow up on the IRS Notice.[124]

But Mr. Goldberg was not so certain in a December 2013 phone conference with private

investigator Patrick Timlin.[125] A series of notes from that conversation reflect that Mr. Goldberg

did not recall his conversations with Miele III, but he "speculat[ed] that he probably advised [him]

to contact Franklin directly to get [a] copy of [the] 1099."[126] The notes also reflect that Mr.

Goldberg "agree[d] that he probably helped [Miele III] but d[id] not remember specific details

from 20 years ago."[127]

When asked about the notes at his deposition, Mr. Goldberg testified that in 2013 (the date of

the notes), he did not recall "specifically what [he] told [Miele III]" in 1992.[128] He explained that

"[he] speculated that [he] probably told [Miele III] to contact Franklin directly to get a copy of the

1099, which is what [his firm's] procedure would have been."[129] And when asked if he was sure

---

[119] *Id.* at 160–62 (pp. 64–70).

[120] *Id.*

[121] *Id.* at 161–62 (pp. 68–69).

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] *Id.* at 173 (pp. 114–15).

[126] Molumphy Decl., Ex. 105.

[127] *Id.*

[128] 8/10/2016 Goldberg Dep. at 173 (pp. 114–15).

[129] *Id.*

that he followed exactly his firm's general practices when advising Miele III, Mr. Goldberg responded: "No, I don't recall what I told him in 1992."[130]

Miele III also recounts his conversations with Mr. Goldberg. According to him, Mr. Goldberg advised: "you owe $19,066. Pay the tax. You have the money. Forget about it. You don't want to get in trouble[ and] [y]ou don't want to have any problems."[131] Miele III says that he asked Mr. Goldberg "Why am I paying this?"[132] But Mr. Goldberg responded: "the IRS is like the legal mafia. You don't want to mess with them. Just pay it."[133] And so that is what Miele III did: he paid the $19,066 in taxes, interest, and penalties.[134]

### 3. 2012–2015: Miele III Sues Franklin Resources and Charles Johnson for His Missing Shares

In May 2012, Charles Johnson (former Franklin President, CEO, and Chairman), wrote to Veronica Miele's father-in-law.[135] Mr. Johnson asked if Veronica was related to Anthony Miele, and, if so, said that "[he] ha[d] an interesting story for her."[136] Mr. Johnson believed that he had prevented the Mieles' Franklin shares from escheating to the state in 1986 or 1987 and had heard that the Mieles "were very grateful for what [he] had done for them."[137] But he found it "really kind of curious why [he] hadn't heard from them" to thank him for his efforts.[138] Only later did the Mieles tell him that "they didn't know anything about the [Franklin] stock."[139]

Miele III, Veronica, and Matthew spoke with Mr. Johnson in April or May 2013.[140] Mr. Johnson told the Miele children about selling the 4,000 shares to their father, Miele Jr.[141] And he

---

[130] Id.

[131] Miele III Dep. at 73 (pp. 269–70).

[132] Id.

[133] Id.

[134] Id.

[135] Liddle Decl. – ECF No. 127-1, Ex. 10.

[136] Id.

[137] Johnson Dep. – ECF No. 136-3 at 184, 210, 220 (pp. 7–8, 112, 151).

[138] Id. at 184, 208 (pp. 8, 105).

[139] Id. at 207–08 (pp. 101–02).

[140] Miele III Dep. at 35–36 (pp. 117–23).

told them that "the mail kept getting sent back to [him]" and he got "escheatment letters from the State of New Jersey."[142] Mr. Johnson explained that in 1986 or 1988 he asked Mr. Mulvihill to find Miele III.[143] And, around that time, Mr. Mulvihill told him that he had "paid the Mieles" or otherwise "taken care of [them]."[144] But, when the Miele children questioned Mr. Johnson about the missing shares and why he did not contact them earlier, he told them to "get a lawyer and sue the Mulvihill estate."[145]

Over a year and a half later, Miele III sued Mr. Johnson and Franklin.[146] In his amended complaint, Miele III asserted seven claims; the court dismissed five claims following Franklin's motion to dismiss; and two remain: (1) wrongful registration of securities, 6 Del. C. § 8-404; and (2) replacement of lost, destroyed, or wrongfully taken security certificates, *id.* § 8-405.[147]

The parties filed cross-motions for summary judgment. Miele III moves for partial summary judgment under section 8-405 for the replacement of his allegedly lost, destroyed, or wrongfully transferred shares of Franklin stock.[148] Franklin moves for summary judgment on the two claims based on two affirmative defenses: (1) unreasonable delay under Delaware Code section 8-406, and (2) laches.[149] Franklin also asserts that Miele III has not carried his burden to establish his claims for relief.[150] The court held a hearing on the matter on March 23, 2017.[151]

---

[141] *Id.* at 35 (pp. 119–20).

[142] *Id.* at 35 (p. 120).

[143] *Id.* at 35–36 (pp. 120–21).

[144] Johnson Dep. at 207–08 (pp. 101–02).

[145] Miele III Dep. at 36 (pp. 121–22).

[146] *See* Compl. – ECF No. 1.

[147] Amended Compl. – ECF No. 17, ¶¶ 148–60; Order re Motion to Dismiss – ECF No. 45.

[148] Miele III's Motion for Summary Judgment – ECF No. 127; *see also* ECF Nos. 148 & 154.

[149] Franklin's Motion for Summary Judgment – ECF No. 128.

[150] *Id.*

[151] Minute Entry – ECF No. 184.

**GOVERNING LAW**

The court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49.

The party moving for summary judgment has the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, inferences drawn from the underlying facts are viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

Franklin contends that it is entitled to summary judgment under Delaware Code section 8-406. The court grants Franklin summary judgment based on that affirmative defense.

Delaware Code section 8-406 provides a defense to claims for wrongful registration (section 8-404) and for the replacement of lost, destroyed, or wrongfully taken securities (section 8-405). Section 8-406 provides:

> If a security certificate has been lost, apparently destroyed, or wrongfully taken, and the owner fails to notify the issuer of that fact within a reasonable time after the owner has notice of it and the issuer registers a transfer of the security before receiving notification, the owner may not assert against the issuer a claim for registering the transfer under Section 8-404 or a claim to a new security certificate under Section 8-405.

6 Del. C. § 8-406. A defendant may thus defeat a plaintiff's section 8-404 and 8-405 claims if the plaintiff does not notify the issuer that the security certificate has been lost, apparently destroyed, or wrongfully taken "within a reasonable time" after the plaintiff learns of this fact. *Id.* The issuer must also have registered a transfer of the security before it receives the plaintiff's notice. *Id.*

Here, under section 8-406, there are three issues: (1) did Miele III have notice in 1992 that his Franklin shares were lost, destroyed, or wrongfully transferred? (2) If so, did he notify Franklin of that fact within a reasonable time? (3) And, did he notify Franklin before it registered a transfer of the shares to another shareholder?

## 1. Miele III Had Inquiry Notice in 1992

The first issue is whether the 1992 IRS Notice put Miele III on notice that he owned Franklin shares and that those shares were lost, destroyed, or stolen.

"Notice" does not necessarily mean "knowledge," which is defined as "actual knowledge." 6 Del. Code § 1-202(a), (b). Instead, "a person has 'notice' of a fact if the person: (1) [h]as actual knowledge of it; (2) [h]as received a notice or notification of it; or (3) [f]rom all the facts and

circumstances known to the person at the time in question, has reason to know that it exists." *Id.* § 1-202(a); *see Weller v. Am. Tel. & Tel. Co.*, 290 A.2d 842, 845 (Del. Ch. 1972). And so, under section 8-406, a shareholder who "knows or has reason to know of the loss or theft of a security certificate" but "fails to notify the issuer within a reasonable time" thereafter is estopped "from asserting . . . the wrongfulness of the registration of the transfer." U.C.C. § 8-406 cmt.

In similar contexts, Delaware courts also apply inquiry notice. *See In re Dean Witter P'ship Litig.*, 1998 Del. Ch. LEXIS 133, *29–*39 (Del. Ch. 1998) (applying inquiry notice to determine whether a limitations period should be equitably tolled); *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, *19–*20 (De. Ch. 2013) (same). A plaintiff is placed on inquiry notice if, under the circumstances, "persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued*, would lead to the discovery of the injury." *In re Dean Witter*, 1998 Del. Ch. LEXIS 133 at *30 (emphasis in original). "Inquiry notice does *not* require *actual* discovery of the reason for the injury" and does not "require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct." *Id.* at *31 (emphasis in original). Instead, "'once a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice." *Id.* at *31 n.49 (quoting *Harner v. Prudential Secs. Inc.*, 785 F. Supp. 626, 633 (E.D. Mich. 1992)). And "whatever is notice calling for inquiry is notice of everything to which such inquiry might have led." *United States Cellular Inv. Co. v. Bell Atl. Mobile Sys.*, 677 A.2d 497, 503 n.7 (Del. 1995).

In *In re Dean Witter*, the statute of limitations barred the plaintiff-investors' claims because "[i]nformation available to [them] long before" the lawsuit put them on inquiry notice. 1998 Del. Ch. LEXIS 133 at *1–*2. There, the plaintiffs — investors in partnership interests sold by or through Dean Witter — alleged that the "defendants breached their fiduciary duties in connection with the Partnerships [they] organized, sold[,] and operated." *Id.* at *7. The defendants argued that the plaintiffs' supporting facts were disclosed in documents publicly available years before. *Id.* at *26–*27. Looking to one such document, the plaintiffs "assert[ed] that they could not have known that Partnership capital was being impaired, in light of the statement that the 'distribution . . . was an annualized return on investment of 7.5%.'" *Id.* at *33. But the court noted, in that same

document only three pages away, "a chart show[ed] clearly that the partners' capital had declined from the previous year." *Id.* And from "even the most cursory glance" at a chart two pages later, it was apparent that "the amount of cash distributions for the year 1990 far exceeded the Partnerships' net income for the same year." *Id.* Reasoning that "[i]t is not too much to ask investors to read beyond the first page of an annual report," the court found that had the plaintiffs read further, "they would have been alarmed." *Id.* at *36–*37. And so the plaintiffs had inquiry notice and equitable tolling did not save their claims, which were barred by the statute of limitations. *Id.* at *39–*41.

Here, as in *In re Dean Witter*, Miele III had access to information that, if pursued, would have led to the discovery that something was wrong with the Franklin shares. Miele III admits that he received the IRS's Notice of proposed changes to his 1989 tax return. He testified that he only read the first three lines, learned that he owed $19,066 in extra taxes, and then stopped.[152] He called his mother, Mr. Mulvihill, and his new accountant, Mr. Goldberg.[153] The parties dispute the advice that Mr. Goldberg gave him, and, indeed, his testimony is not clear.

But this much is clear: a reasonable person, having learned that he owed an additional $19,066 in taxes — over two thirds of his reported taxable income[154] and approximately half of his unreported sports-bookie profits of $30,000–$50,000 per year[155] — would have read on. (The amount was so great that Miele III "freaked out."[156]) And the Notice's very next sentence reads: "Please compare your records with the payer information shown on page 3 of this notice."[157] Page 3, only four lines down and in table format, shows $41,250 in Franklin dividends.[158] That is over

---

[152] Miele III Dep. at 32 (pp. 107–08).

[153] *Id.*

[154] The IRS Notice shows that Miele III reported $28,540 in taxable income. (Molumphy Decl., Ex. 77.) $19,066 is approximately 66.8% of $28540.

[155] Miele III Dep. at 33–34, 71–72 (pp. 110–13, 264–65).

[156] Molumphy Decl., Ex. 77.

[157] *Id.*

[158] *Id.*

1   140% of the reported taxable income, and roughly equal to Miele III's claimed yearly sports-

2   bookie profits.

3       Even a cursory glance at page 3's table would have revealed that he was taxed on unreceived

4   dividends issued on Franklin shares. That is sufficient to make him suspicious that (1) he might

5   own Franklin shares but (2) the dividends were being sent somewhere else (and that the shares

6   may have been lost or stolen). And, based on that information, a reasonable inquiry — *i.e.* a call or

7   letter to Franklin or BoNY, both of which were listed in-line with the dividends — would have

8   uncovered his injuries.

9       For example, the unrebutted evidence shows that if Miele III had contacted Franklin or BoNY

10  in May 1992, they would have seen reflected in Franklin's Record Stockholder list 13,750 shares

11  registered to "Anthony P Miele Jr TTEE Anthony P Miele III."[159] They would also have noticed

12  that only nine months prior, "Anthony P. Miele Jr. TTEE Anthony P. Miele III" had a total

13  position of 140,625 shares (128,125 shares held by BoNY).[160] They may also have noticed that

14  two Seaboard Surety applications for replacement securities had been filed in 1991 — one in July

15  and one in December — both with Anthony P. Miele III's (purported) signature.[161] And, at the

16  very least, BoNY would have seen the replacement 5,000-share certificate that it issued to

17  "Anthony P. Miele Jr. TTEE Anthony P. Miele, III."[162]

18      These facts would have shown him that, over the previous year, his (newly discovered)

19  Franklin holdings dwindled from 140,625 to 13,750 shares and that someone forged his signature

20  on two Seaboard security-replacement applications. Miele III's reasonable inquiry — *i.e.* a phone

21  call or letter — thus would have uncovered sufficient facts to discover the alleged injury (that his

22  Franklin shares were wrongfully taken).

23      But Miele III argues that "the 1992 IRS Notice of a tax deficiency did not and could not have

24  provided Miele III with notice that his Franklin security certificates were *wrongfully taken*, as

---

[159] Gray Decl. ¶ 7, Ex. 121 (also filed at ECF No. 126-11 at 32–35).

[160] Molumphy Decl., Ex. 49.

[161] *Id.*. Exs. 51, 64.

[162] Molumphy Decl., Ex. 71.

1   statutorily required by § 8-406."[163] Instead, he argues, "[t]he IRS notice at most could have alerted

2   [him] to the existence of the Franklin shares."[164]

3       Not so. First, the IRS Notice (if read) would plainly put Miele III on notice that he owned

4   Franklin shares and that there was something wrong with them — at the very least, that he was not

5   receiving the dividends. There is no other reasonable conclusion when asked to pay $19,066 in

6   taxes on $41,250 in Franklin dividends that he did not receive. And, as shown above, a reasonable

7   inquiry would have uncovered the injury.

8       Second, even though the Notice may not have revealed every fact necessary for Miele III to

9   state a claim under sections 8-404 or 8-405, that is not necessary for inquiry notice. Such notice

10  exists where "persons of ordinary intelligence and prudence would have facts sufficient to put

11  them on inquiry which, *if pursued*, would lead to the discovery of the injury," and "does *not*

12  require . . . plaintiffs' awareness of all of the aspects of the alleged wrongful conduct." *In re Dean*

13  *Witter*, 1998 Del. Ch. LEXIS 133 at *30–*31 (emphasis in original). That standard is satisfied

14  here through unrebutted evidence.

15      Miele III also argues that "Delaware courts have 'expressed reluctance to find inquiry notice

16  when a Plaintiff would have to piece together information from various documents.'"[165] *See*

17  *Microsoft*, 2013 WL 5899003 at *19. Indeed, he says, "'there was no 'red flag' that clearly and

18  unmistakably would have led a prudent person of ordinary intelligence to inquire' whether

19  securities were wrongfully taken on account of a[n] IRS notice of tax deficiency."[166] *See Coleman*

20  *v. Pricewaterhousecoopers, LLC*, 854 A.2d 838, 843 (Del. 2004).

21      In *Microsoft*, Microsoft (an investor in the defendant) asserted, among other things, that the

22  defendant-company's founder usurped a corporate opportunity to sell the company's patents. 2013

23  WL 5899003 at *19. The defendants argued that Microsoft had inquiry notice of the claim "by

24  virtue of the Information Statement that was sent to [the company's] shareholders in connection

25

26  ---
    [163] Miele III Opposition – ECF No. 160 at 29 (emphasis in original).
    [164] *Id.* at 30.
27  [165] *Id.* at 29.
28  [166] *Id.*

with [its] restructuring and possible merger." *Id.* But even if Microsoft had "exercised reasonable diligence," it would not have been "on inquiry notice that there was a corporate opportunity to sell the [company's] Patents, let alone that [the founder] had usurped that opportunity." *Id.* Microsoft may have had constructive notice of a patent sale six years later when the defendants filed a sale agreement with the United States Patent and Trademark Office. *Id.* But even so, Microsoft did not have inquiry notice of the founder's usurpation of the corporate opportunity because (1) Delaware courts have "expressed a reluctance to find inquiry notice when a plaintiff would have to piece together information from various documents," and (2) "[e]ven if that was not the case, it would be unreasonable in this instance to expect Microsoft to draw a connection between the Information Statement and a document that was filed publicly six years later." *Id.* The court thus concluded that it was "reasonably conceivable that Microsoft w[ould] be able to prove that it was not on inquiry notice" of the usurpation claim. *Id.*

In a similar case, *Weiss v. Swanson*, the plaintiff's claims were timely as pled. 948 A.2d 433, 450 (Del. Ch. 2008). There, the plaintiff-investor alleged that the defendant-directors granted stock options in violation of the company's option plans. *See id.* at 438–40. The plaintiff asserted equitable tolling of the limitations period, but the defendants argued that "he could have pieced together the alleged practice of timing option grants from publicly available information." *Id.* at 451–52. "[T]he information needed to put" the plaintiff on notice, though, "did not appear in one document." *Id.* at 452. Instead, the plaintiff "would have had to cull through the company's Form 4s each time they were filed, compare the grant dates of the options with the timing of the quarterly earnings releases, and then conduct a statistical analysis in order to uncover the alleged malfeasance." *Id.* Noting that "[t]here [was] nothing in the Form 4s giving any indication of a connection to the quarterly earnings release," the court concluded that "[s]uch an investigation is beyond 'reasonable' diligence." *Id.* at 452 n.85.

Here, unlike *Microsoft* and *Weiss*, the single IRS Notice contained sufficient information to put Miele III on inquiry notice. Unlike the plaintiffs in those cases, Miele III did not need to cull through several, temporally distant filings to raise suspicion of the injury. Instead, the Notice itself, taxing Miele III $19,066 on $41,250 in dividends that he did not receive, constitutes a "'red

flag' that clearly and unmistakably would have led a prudent person of ordinary intelligence to inquire" whether there was a problem with his Franklin-share ownership. *Cf. Coleman*, 854 A.2d at 843. It is true that Miele III would need to undertake further investigation to learn and prove all the facts of his claim. But here, unlike *Microsoft* and *Weiss*, the single, five-page IRS Notice contained sufficient facts to put Miele III on notice such that, if pursued, would lead to discovery of his injury.

Miele III thus had inquiry notice that his Franklin shares were lost, destroyed, or wrongfully taken in 1992.

### 2. Miele III Did Not Notify Franklin Within a Reasonable Time

The second issue is whether Miele III notified Franklin that his shares were lost, destroyed, or wrongfully taken within a reasonable time after learning that fact.

"A person 'notifies' or 'gives' a notice or notification to another person by taking such steps as may be reasonably required to inform the other person in ordinary course, whether or not the other person actually comes to know of it." 6 Del. C. § 1-202(d). And, "[w]hether a time for taking an action required by Uniform Commercial Code is reasonable depends on the nature, purpose and circumstances of the action." *Id* § 1-205(a); *see Weller*, 290 A.2d at 845 (looking to former Delaware Code § 1-204, which is current Delaware Code § 1-205, to define what a "reasonable time" is under former Delaware code § 8-405, which is current Delaware Code § 8-406).

Here, as discussed above, Miele III had inquiry notice that his shares were lost, destroyed, or stolen in 1992. Yet he did not speak with Mr. Johnson until 2013, and he did not sue until January 2015.[167] Miele III thus waited over twenty years before notifying Franklin — *i.e.* providing it the necessary information to inform it of his claims. He asserts that "the 'reasonable time' question would be inappropriately decided on summary judgment,"[168] but, under the circumstances, the twenty-plus year delay is plainly unreasonable.

---

[167] *See* Miele III Dep. at 35–36 (pp. 117–23); Compl. – ECF No. 1.

[168] Miele III Opposition at 30.

### 3. Franklin Registered a Transfer of the Shares Before Receiving Notice

The third issue is whether Franklin registered a transfer of the shares before Miele III gave notice.

Miele III argues that "Franklin cannot establish that it registered a transfer of [his] shares because it has no record of a re-registration or transfer of the securities."[169] Miele III points to the documentation that BoNY would need to transfer his shares, including: a physical stock certificate; "a stock power with a signature guarantee"; "proof of the trust"; a fiduciary release; "proof of ownership," such as a birth certificate or passport; information about the "transfer of ownership" (*i.e.* the owners' information); and, in the case of restricted securities, "a letter of authority from the issuer" or a "legal letter from the issuer allowing" the release of the restriction.[170] Ms. Gray, Franklin's Corporate Secretary, testified that she found no evidence — *i.e.* the above documentation — that the shares "were ever registered into the name of another person."[171]

This type of documentation would certainly be the *best* evidence of a transfer and registration, but Miele III points to no authority that it is the *only* evidence that would suffice. In light of BoNY's record-retention policy (which is seven years, one year more than the SEC's requirement), and the delay in bringing the case, the unrebutted evidence adequately establishes that Franklin registered a transfer of the shares.[172]

That evidence includes BoNY representative Peter Ward's testimony about the share-transfer process.[173] He testified that, when shares are transferred, it cancels one shareholder's position (or a portion thereof) and transfers that ownership to another shareholder.[174] So, "[t]he former owner's position would be reduced by" the transfer, and "the certificate would be canceled outright."[175]

---

[169] *Id.* at 28.

[170] Miele III Motion for Summary Judgment at 15; Hanrahan Dep. at 19, 45–46 (pp. 62–63, 166–71).

[171] Gray Dep. at 66 (pp. 128–29).

[172] *See* Flynn Decl. – ECF No. 163, ¶ 10.

[173] Ward Dep. – ECF No. 148-2 at 401–02 (pp. 27–29).

[174] *Id.*

[175] *Id.*

Mr. Ward also testified that "[o]ther than an actual transfer taking place or escheatment" of shares to the state, he could not think of a reason why a shareholder's name would no longer appear on the annual stockholder list.[176] Computershare's representative (Franklin's current transfer agent) testified to the same.[177]

Here, as of March 4, 1991, Miele III had a total position of 140,625 shares — he held 12,500 and BoNY had 128,125 in its vault.[178] But in December 1991, Franklin's records reflect only 13,750 shares registered to "Anthony P Miele Jr TTEE Anthony P Miele III."[179] And by December 1992, neither "Anthony P Miele Jr TTEE Anthony P Miele III" nor "Anthony P. Miele III" appears on Franklin's Stockholder List.[180] In light of the unrebutted testimony of Mr. Ward and Ms. Gray's declaration that a transfer occurred, this can only mean Miele III's shares were sold. Indeed, from all the records, the conclusion is that the restriction was removed from the stock, and the stock was put into street name and sold.

And there is substantial evidence (whether Miele III knew it or not) that Mr. Mulvihill sold the Franklin shares in 1991. Charles Johnson testified that he asked Mr. Mulvihill to find the Mieles and that Mr. Mulvihill told him "he had paid the Mieles," that "they had gotten something or other," or that he "had taken care of [them]."[181] Mr. Mulvihill told Mr. Passante (his accountant) that he was going to fund the Mieles' four trusts with Franklin shares.[182] And it is undisputed that — between 1991 and 1992 — Mr. Mulvihill paid the Mieles at least $3,135,382 and sold 92,875 Franklin shares from his F.N. Wolf account for approximately $3,382,299.

Miele III argues that the shares sold from Mr. Mulvihill's F.N. Wolf account were not his. He asserts that Mulvihill owned Franklin shares "in his own right" and points to a Franklin certificate

---

[176] Ward & Harrington Dep. – ECF No. 176-1 at 22–23 (pp. 72–73).

[177] *Id.* at 22–23 (pp. 72–74).

[178] Molumphy Decl., Ex. 49.

[179] Gray Decl. ¶ 7, Ex. 121.

[180] *Id.* ¶ 8.

[181] Johnson Dep. at 207–08 (pp. 101–02).

[182] Passante Dep. at 298 (p. 109–11).

representing 134 shares, held by Flow & Company, Mr. Mulvihill's business.[183] He presumes that Mulvihill got these shares (and possibly others) from his work on Franklin's IPO. And at the summary-judgment hearing, Miele III argued that Mr. Mulvihill may have acquired his Franklin shares through a "so-called VIP Program, where a VIP such as Mr. Johnson" could tell BoNY to issue stock to a VIP shareholder.[184] These theories are not supported by the evidence, which instead indicates that Mr. Mulvihill sold Miele III's shares. This includes (in addition to the above) Ms. Lewis's April 1992 letter to BoNY that describes a possible transfer of 6,250 Franklin shares from Miele III to Mr. Mulvihill's F.N. Wolf account.[185] And again, Franklin's stockholder list shows the decline in Miele III's shares as they were sold in 1991.

The undisputed evidence thus shows: (1) Mr. Mulvihill paid the Mieles approximately $3 million; (2) Mr. Mulvihill sold approximately $3 million worth of Franklin shares; and (3) Miele III's name was removed from Franklin's books during the same period. In light of Mr. Ward's testimony, there is no genuine dispute that Franklin registered a transfer of Miele III's shares in 1991–92, the same time during which Miele III's holdings were taken off the books, and well before it received notice of Miele III's claims.

*       *       *

In sum, Miele III had inquiry notice that his shares were lost or wrongfully transferred in 1992, but he did not notify Franklin until (at the earliest) 2013, well after Franklin registered a transfer of his shares. Franklin has established its affirmative defense under Delaware Code section 8-406, and it is entitled to judgment as a matter of law. This defense disposes of the remaining claims. The court thus does not reach Franklin's laches defense or the merits of Miele III's section 8-405 claim.

---

[183] Miele III Opposition at 20; Liddle Decl. – ECF No. 160-1, Ex. 33.

[184] 3/23/2017 Hearing Tr. – ECF No. 187 at 48.

[185] Molumphy Decl., Ex. 76.

# CONCLUSION

The court grants Franklin's summary-judgment motion because there is no genuine dispute of material fact that it is entitled to judgment as a matter of law under Delaware Code section 8-406. The court denies Miele III's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: April 20, 2017

_____
LAUREL BEELER
United States Magistrate Judge